**UNITED STATES**

v.

**Thomas L. HOLBROOK, Defendant.**

**Criminal No. 97–746M–01 (JMF)**

United States District Court,
District of Columbia.

July 21, 1998.

John Gordon Forester, Jr., David Bohan Lamb, Washington, DC, for Thomas M. Holbrook.

**MEMORANDUM OPINION**

FACCIOLA, United States Magistrate Judge.

### Introduction

This matter was before me for a bench trial. At the conclusion of the government's case, the defendant moved for a judgment of acquittal, and I asked the parties to brief the legal issues raised by the government's evidence. They have now done so and I conclude that the defendant's motion should be granted.

This is the prosecution of a so-called "deadbeat dad" whom the government alleges willfully failed to pay a court-imposed obligation to support his child in violation of 18

U.S.C. § 228.[1] The government has proceeded upon the theory that its evidence, showing the receipt of a certain amount of income during a certain period of time or representations by the defendant of his actual income, suffice to show that the defendant's not paying the support obligation was willful.[2] The government, however, rested without eliciting any evidence of the actual expenses the defendant, an independent contractor, had to pay in his business and for his subsistence and housing. Nor did the government produce any evidence that would permit the finder of fact to project those expenses from available sources, such as the statistics collected by government agencies upon which economists rely to calculate the cost of living in a given geographical area. In my view, the absence of such evidence would require me to speculate as to whether or not the defendant had the ability to pay the support obligation. I am therefore compelled to find that the government's proof is too insubstantial to permit the inference that the defendant's not paying his obligation was willful.

To understand that conclusion, I must begin with the facts of this case.

### Background
### THE CHILD SUPPORT OBLIGATION

The defendant and his former wife were married in 1977. Subsequently, the defendant started a restaurant in New York, and his wife worked with him in that restaurant. A child was born on October 11, 1980. Unfortunately, their marriage and the business failed simultaneously. When the defendant was still represented by counsel, the New York court entered a support order, *pendite lite*, requiring the defendant to pay $35 per week. Defendant did not appear at the hearing which culminated in the final divorce decree and no counsel entered an appearance for him. Instead, counsel who had represented him reported to the New York court that he had not paid them and could not be located. The New York court proceeded in his absence, imputed to him an earning capacity of $60,000 to $75,000 a year and ordered him to pay $250 per week for the support of his child. It also ordered him to pay almost $26,000 in arrearages and approximately $10,000 in attorneys fees which had accumulated since the order, *pendite lite*. Gov. Exs. 10 and 11.

In a letter dated June 27, 1983 the defendant indicated he was enclosing "the alimony and support checks thru [*sic*] this current week June 30, 1983." Gov. Ex. 7.[3] He transmitted to his wife medical insurance policies to be filled out and provided his wife with a new New York address. By a July 21, 1983 letter, the defendant sought information about his son. Accompanying the July 21 letter were two checks totaling $2030. Gov. Exs. 6 and 6A.

The final divorce decree was entered on May 1, 1986. In December 1987, defendant wrote his former wife to tell her that he was trying to "put his life back in order after complete and utter chaos." Gov. Ex. 12. He provided her with a California address and begged her to write him. On January 10, 1988, he wrote his wife again. He had sent his son Christmas gifts and expressed the hope that they fit. He had learned that his former wife had remarried and wished her well. He expressed a desire to "catch up on [the] economical side of what I owe you." Gov. Ex. 13. He also urged his wife to communicate with him about his son. She did not, however, and in his next letter, he expressed his frustration that he never learned if the gifts he had sent fit his son and were what he needed. He again expressed

---

1. The statute states in pertinent part that "[w]hoever willfully fails to pay a past due support obligation with respect to a child who resides in another State shall be punished...." 18 U.S.C. § 228(a). Even though much of the government's evidence included statements and actions which took place during the 1980's, it charged the defendant with willful failure to pay child support only since the effective date of the statute, October 12, 1992, to avoid impermissible *ex post facto* application of a criminal law.

2. All references to the evidence in the Memorandum Opinion are to the government's exhibits introduced at trial ("Gov.Ex.") and to the trial transcript ("Trans.").

3. Copies of the checks were not attached to the letter.

his desire to contribute to his son's emotional and financial stability. Gov. Ex. 14. On April 23, 1988, he again, by letter, begged his former wife to write him and to permit their son to write to him. Gov. Ex. 15. His wife responded on May 5, 1988, chastising the defendant for his failure to exercise his visitation rights for 7 years.[4] She asked the defendant for the $63,000 she was owed. She suggested that it was possible to work out a way in which the defendant might be able to see their child. Gov. Ex. 16. The defendant, in his next letter, thanked his wife for her letter and acceded to her request that he not come to see his son until she could secure professional guidance as how best to introduce the child to his father. The defendant, indicating that the last thing he wanted to do was "to pop into [the child's] life and then out again as quickly as I came in" for fear that this would cause the child emotional problems, asked his wife to propose a solution according to which he would remain in Washington for a certain period of time and see the child during that period of time. Gov. Ex. 17 (dated May 31, 1988). By the next letter, dated July 10, 1988, however, the defendant had learned that his wife would not permit him to see the child. He warned her that he would take legal action in the Family Court in Maryland to establish his right to see the child. Gov. Ex. 18. On July 29, 1988 the defendant expressed his willingness to meet with a Dr. Jacobson, a child psychologist his former wife insisted that he consult so that the doctor could recommend whether and under what circumstances he should see the child.

On August 6, 1989, the defendant, for the first time, challenged that he was the child's father after receiving pictures of his son. Gov. Ex. 20. On March 7, 1990 the defendant advised his former wife of a medical condition he had and indicated he would be sending her his family's medical history for the child's wellbeing. Gov. Ex. 21. On May 7, 1990 he begged his former wife to communicate with him in reference to a discussion they had had concerning the child. Gov. Ex.

22. On June 8, 1990, the defendant wrote his wife to tell her that he had made the most difficult decision of his life, to return to Washington to battle for his child's custody. He told her that he was giving up a lucrative career in California. He chastised his wife for not permitting his family to get to know the child. Gov. Ex. 23. On November 27, 1990 he wrote his wife to say that he was going to take a job in Michigan if he could not find a job in Washington. He told her that he had sent his resume to Washington businesses. He also expressed interest in another California restaurant chain because it had a business in Washington which would bring him frequently to the Washington area. Gov. Ex. 24. Ultimately, defendant returned to the D.C. area, motivated (at least in part) by a desire to have a relationship with the child.

In 1993, the defendant and the child's mother met with a therapist to see if arrangements could be made that would permit the defendant to see the child. According to the mother, when the therapist brought up the defendant's unfulfilled support obligations, the defendant became angry and refused to ever meet with the psychologist again. Trans. at 61. According to a pleading the defendant filed in a Maryland court, the mother demanded $25,000 as a condition of seeing the child. Gov. Ex. 31 (Complaint in the Montgomery County Declaratory Judgment action at 4).

The mother of the child, who lives in Montgomery County, Maryland, availed herself of the Uniform Reciprocal Enforcement of Support Act ("URESA") and sought enforcement of the New York divorce decree in October 1994. Trans. at 61. Defendant countered by bringing an action in Maryland, challenging his paternity. He ultimately submitted to DNA testing, however. When the DNA test established that he was the father of the child, the portion of the petition seeking a declaratory judgment that he was not the child's father was dismissed or denied. Gov. Ex. 31.

---

4. The decree *pendite lite* granted the defendant visitation rights; the final decree was silent on visitation. The decree *pendite lite* was entered on July 7, 1981 and the final divorce decree on May 1, 1986. Perhaps, the 7 years to which the wife refers is from July 7, 1981 to the date of her letter in 1988.

In the meanwhile, pursuant to URESA, the D.C. Superior Court ordered the defendant to pay monthly on his support obligation. Since the entry of that order, approximately $1500 has been deducted each month from the income he was paid from REMAX, the company with whom he is associated as a licensed real estate agent. The defendant is presently paying his support obligation, although there is, of course, a substantial arrearage from the many years in which no payment was made. The child is a teenager and headed toward college. As I understand the situation, he has never seen his father, except for one 15-minute interval. According to the last pleading filed in the Maryland court action which commenced with the defendant's petition for a declaration that he was not the child's father, the mother agreed to some visitation rights and the parties await an order from the Maryland court establishing what those rights are. Thus, the defendant is paying his support obligation and will soon see his son.

## THE STATUTE AND ITS LEGISLATIVE HISTORY

That this matter is in a federal court is startling. The federal courts have invariably refused to permit their diversity jurisdiction to be used in matters of divorce and child custody, acknowledging the natural primacy of state courts in such matters and their broad equitable powers, created by statute or common law, to act in the best interest of the child. *Ankenbrandt v. Richards*, 504 U.S. 689, 112 S.Ct. 2206, 119 L.Ed.2d 468 (1992). That the case is in a federal court is the result of a statute passed by Congress which criminalizes the failure to pay child support. More particularly, thanks to 18 U.S.C. § 228, it is now a federal crime to fail to pay the child support for a child who lives in a different state from the debtor parent, provided the debtor parent has failed to pay that obligation for more than one year or the amount past due is greater than $5,000. 18 U.S.C. § 228.

The legislative history of that statute indicates that the statute's proponents were con-

vinced that the traditional remedies provided the spouse awarded child support by the non-custodial parent (nearly always the father) were inadequate when the father left the jurisdiction and went to another state. While URESA provided some relief, the bill's supporters thought it clumsy and bureaucratic.[5] They therefore believed that federal criminal action was appropriate. Members of Congress believed that the mere possibility of being subjected to federal prosecution and being chased by a relentless FBI would bring "deadbeat dads" to their senses. Faced with a federal prosecution from which they could not escape by merely crossing a state line, they would pay what they were due before the federal ax fell. *Criminal Penalty for Flight to Avoid Payment of Arrearages in Child Support: Hearing on S.1002 Before the Subcomm. On Juvenile Justice of the Senate Comm. on the Judiciary*, 102nd Cong. 7-8 (1992) (statement of Richard C. Shelby, Senator from Alabama) [hereinafter "Hearing"]; *id.* at 89 (statement of Beth Mason, member, United States Commission on Interstate Child Support); 138 Cong Rec. H7327 (daily ed. August 4, 1992) (statement of Rep. Lloyd) (delinquent parent less likely to flee if faced with prospect of facing federal felony); (statement of Rep. Hoyer) (same); *id.* at H7326 (statement of Rep. Hyde) (deterrent effect of relentless FBI and federal penitentiary should prevent interstate flight to avoid support obligation in the first place).

The archetypical "deadbeat dad" at which Congress addressed its fire was the kind of man whose wife testified at the hearings held on the bill in the Senate. Hearing, *supra*, *passim*. For example, the couple was divorced in Oklahoma and the father did not pay his child support. As soon as he heard the footsteps of his ex-wife and her lawyer, seeking a contempt citation, he moved to Texas. Once the wife tracked him down in Texas, he moved to Missouri. *See, e.g.*, Hearing at 16-19 (statement of Rebecca Richardson, who had such an experience with her husband). The theory contemplated by Congress was that once he landed in Mis-

---

5. This case shows how justified that criticism was. The mother sought help under URESA in

October 1994 but only began receiving payments on the order in late 1997. Trans. at 89.

souri, and was met by the FBI and a federal criminal complaint, he would realize that he could run but could not hide and would pay what was due.[6]

### Analysis

When one examines the legislative history of that statute, it becomes clear that, unlike the expensive suits the government alleges the defendant favored, he and the statute are a poor fit.

First, there is little evidence he left New York solely to avoid his support obligation. In his letters he protests that he left New York because his business failed and his wife's testimony at trial did not dispute that the business did fail. When he gained work in California, he wrote back to his wife, providing her with an address, and acknowledged an obligation[7] to support his son. He then moved back to the D.C. area, motivated at least in part by a desire to have some sort or relationship with his son. Finally, once his paternity was established, a support order was entered and by force of law the payments are being deducted from the income due him from REMAX. Thus, the defendant moved back to the D.C. area to assert his right to have some relationship with his child as opposed to running in the other direction to evade the obligation to support that child. Moreover, the obligation to pay was imposed before the criminal prosecution was brought meaning that the URESA worked before the defendant became aware that a criminal prosecution would be brought against him. Finally, the power Congress gave federal courts to impose as a condition of probation that a deadbeat dad pay his support obligation is completely unnecessary since deductions are already being made from his income.

■■■ This defendant is so unlike the archetype of the "deadbeat dad" that Congress posited that the decision to prosecute him is puzzling. It is of no moment since that decision is ordinarily not subject to judicial review. What is subject to judicial determination is whether the government produced sufficient evidence to permit me to conclude, beyond a reasonable doubt, that the defendant is guilty.[8] I conclude that it did not produce sufficient evidence to permit me to conclude beyond a reasonable doubt that the defendant was able to pay his support obligation in the period charged in the information.

The government has proceeded upon the theory that it met it burden by showing that in a given period of time that the defendant had a certain amount of income and therefore his failure to pay his child support was willful. The government, however, never introduced the defendant's tax returns so that the defendant's actual, admitted income could be ascertained. Those returns would have also shown the defendant's taxable income (his income less exemption and deductions) (standard or actual) and his income after

---

6. It is notable how often in the legislative history the bill is described as punishing interstate flight to avoid paying a child support obligation, similar to interstate flight to avoid prosecution. *E.g.* Hearing at 4 (statement of Sen. Biden); *id.* at 8 (statement of Sen. Shelby); *id.* at 12 (statement of Sen. Specter); *id.* at 15 (statement of Sen. D'Amato); 138 Cong. Rec. H7326 (daily ed. August 4, 1992) (statement of Rep. Hyde) (long felt that interstate flight to avoid child support should be a federal crime); *id.* (statement of Rep. Hyde) (bill makes it a crime to cross a state line to avoid child support). In fact, the "deadbeat dad" can be prosecuted if he remains in the state where he, the mother and the child lived before the divorce and the mother and child move to another state.

7. Defendant insists to this day that he was never aware of the support obligation imposed by the New York court which had been entered in his absence until 1996 when his wife sought enforce-

ment of the final divorce decree in Montgomery County. He would insist, once supposes, that the obligation to which he referred was to the obligation imposed, *pendite lite,* or to a moral obligation. The government accuses him of either knowing of the final divorce decree or of rendering himself purposefully ignorant of his obligation. In light of my concluding that the government has failed to establish the defendant's ability to pay, there is no reason to resolve that factual issue at this point.

8. This standard is most generous to the government. The evidence is to be viewed in a light most favorable to the government, all permissible inferences are to be drawn in its favor and it suffices that a reasonable person could find the defendant guilty. *United States v. Bryant,* 117 F.3d 1464, 1467 (D.C.Cir.1997), *petition for cert. filed,* —— U.S. ——, 118 S.Ct. 1510, 140 L.Ed.2d 664, 66 U.S.L.W. 3428 (1998).

taxes which would have been the only realistic place to begin the estimate of his ability to pay. Without knowing what an American's after-tax income was, one cannot deduce the amount of disposable income he has available to pay other obligations.

To further complicate the matter and diminish the probative force of what the government presented, defendant is not a paid employee of a company who gets a certain paycheck every month. The company with which he is now associated, REMAX, functions quite differently. The company is attractive to the ambitious real estate agent who wants more control over his own business. The agent is not salaried, nor is there a commission split with the brokerage as with most real estate agencies. Instead, RE-MAX charges flat fees associated with advertising, insurance and office expenses incurred by REMAX and the agent keeps virtually 100% of his commission. However, the drawback is that many of the expenses associated with an individual agent's real estate business are borne solely by the agent; he bears more of the risk and more of the reward. Thus, because of the nature of the business, his income may fluctuate from year to year. That seems to be the case here; REMAX reported to the Internal Revenue Service defendant's miscellaneous income as $24,941.56 in 1994, $51,002.50 in 1995, and $66,200 in 1996. Gov. Ex. 46. Although the nature of defendant's prior employer's business is not in evidence, similarly, his income appeared to fluctuate during that employment as well. In 1992, his prior employer, Highland Inn Investors, had reported his income as $35,650. Gov. Ex. 43. In 1993, the same employer had reported the defendant's wages as $54,328.[9] In addition, in 1993, the defendant received unemployment compensation in the amount of $6,900, Gov. Ex. 44, apparently after he moved back to Virginia. Trans. at 281–282. In 1994, the defendant had reported a prize and award of

$24,941, the amount reported by Sandoz and Lamberton (REMAX's predecessor), and unemployment compensation of $2,070. Gov. Ex. 45.

Title 18 U.S.C. § 228 requires that the defendant have failed to pay his support obligation for more than one year. The government concedes that the *ex post facto* clause precludes criminal liability for acts prior to October 12, 1992 and, in any event, there is no evidence of defendant's income in the period of time from the divorce until the submission of the IRS Form 1099 by his employer to the Internal Revenue Service in 1992. The statute requires proof that in a given one year period the defendant failed to pay his support obligation. That must mean, in this case, that there must be proof of the ability to pay a monthly obligation of $1,000 at the end of each month in a given one year period of time. Given such wide swings in the income, predicating the conclusion that in the period in question defendant always had enough income to pay his support obligation at the end of each month in each of these years crosses the line between establishing a fact beyond a reasonable doubt and guessing that it is true.

Additionally, as to the period of time since the defendant became associated with RE-MAX, the government's evidence indicates that the expenses REMAX charged the agent are not the only expenses an agent may incur. He or she may often incur additional expenses which he or she pays out of his or her own pocket. Trans. at 321–323, 339–341. Thus, the only evidence available is that the known expense figure is less than the actual expenses defendant incurred in producing the income he did. While one supposes that an agent might claim such expenses on his tax return as ordinary and necessary, defendant's tax returns are not before the Court. Without them, one cannot subtract a known number from what is a

---

9. Gov. Ex. 44 shows unemployment compensation received from the state of California as well as two W–2s from Highland Inn Investors each showing payments of $27,164. According to the document, the "on file date[s]" of the W–2s are July 8, 1994 and July 12, 1994. These identical payments are added together for a total wage of $54,328 for 1993. This exhibit, a self-authenti- cated IRS document, was moved into evidence without a witness; therefore no explanation was given for its curious format. I do have questions about the document. However, because I am obliged to view the evidence in the light most favorable to the government at this stage, I will assume that the defendant earned $54,328 from his employer in 1993.

fluctuating income stream [10] and arrive at a responsible determination of what the defendant's actual pre-tax income was since he began his association with REMAX. Without knowing that, one cannot possibly deduce what income defendant actually has had since becoming employed by REMAX which would have been available to pay his support obligation in order to conclude that he was able to pay the support obligation that was imposed.

As to the years 1992, 1993 and 1994, defendant's income is known. For 1992, when defendant's income was $35,650, his criminal liability is not at issue prior to October 12, 1992. The defendant's income spiked upward to $61,288 in 1993, but fell to approximately $27,000 in 1994. Interestingly, as for 1992 and 1994, the payment due *exceeds* what the District of Columbia permits as a proper child support payment under its guidelines by nearly $5,000. D.C.Code § 16–916.1(e)(5). The New York court, after all, predicated the support payment on an income of $60,000; defendant earned no more than $35,650 *per annum* in 1992 and 1994. Though not binding, District of Columbia law suggests, if anything, that the defendant was unable to pay the support payment in those years as a matter of law.

As to the entire period, it nearly goes without saying that one's actual income is never equal to one's actual disposable income. The defendant after all had to eat, live somewhere, pay medical insurance and transport himself from his home to his work. The government did not produce either defendant's actual expenses or a projection of what one could reasonably suppose they would be. This is not to suggest that FBI agents should follow deadbeat dads to the supermarket and get copies of their checkout receipts. Projections of the cost of living in a certain geographical area are readily available and are the premise of testimony often heard in survival actions as to an economist's

projections of the loss the decedent's estate suffered from his death. *See Runyon v. District of Columbia,* 463 F.2d 1319, 150 U.S.App. D.C. 228 (1972).

The unfortunate absence of such projections means that to arrive at the conclusion that the defendant was able to pay his support obligation in the period 1993–1997 one has to deduct from an uncertain income figure an unknown business and personal expense figure. The government has therefore failed to provide the finder of fact with a specific figure on either side of the ledger ("income" and "expenses"). Deducting an uncertain figure from an uncertain figure yields an uncertain figure.

For such proof the government substituted atmospherics. Its evidence included a newspaper article showing that the defendant has a taste for expensive suits, his former wife's testimony that she saw him driving a Jaguar, and evidence that he spent a week in Hawaii before Christmas in 1996. Gov. Ex. 26 and 35; Trans. at 69, 87, and 130. But, there is no proof of what the suits cost the defendant and how many of them he bought. As to the Jaguar, the only evidence the government produced was that it was a 1989 model. Gov. Ex. 33. It never offered the blue book value of the car and whether the defendant was making payments on it. Likewise, there was never any proof that the defendant paid for the trip to Hawaii, only that he made an ATM withdrawal there. Trans. at 130.

■ The government would counter that it also proved that the defendant said that he had an annual income of $60,000 when he applied for a credit card, Gov. Ex. 28, and $76,000 when he applied to lease an apartment. Gov. Ex. 33. In addition, there was evidence that he made an offer to purchase a condominium valued at $139,000, Trans. at 144, representing that he had the income to afford it. That is unquestionably true, but none of that evidence provides any information whatsoever about the actual or projected

---

**10.** The government offered Exhibit 47 and claimed that it proved that the defendant has a certain income in the period of time covered by the exhibit. The exhibit, however, is a running balance of income received by the defendant and expenses deducted from his account. All is does is permit a "snapshot" of the defendant's balance with REMAX on a given day. Additionally, even that snapshot, like the Government's Attachment A to its brief, still does not allow for the defendant's unknown and unproven business expenses which he paid out of his own pocket which the government's own witness unquestionably testified the defendant must have incurred.

expenses the defendant incurred in any given period of time so that I, as the finder of fact, could deduce that the defendant must have had $1,000 per month to pay his child support obligation. In making that contention, the government asks me to cross the line between drawing an inference and speculating. A finder of fact is permitted to draw an inference provided that inference is premised on evidence admitted. The finder of fact is not permitted to draw an inference from its own life experience. *United States v. Santistevan*, 39 F.3d 250, 258 (10th Cir.1994) (government is not given benefit of every potential inference but rather "only those inferences reasonably and logically flowing from other evidence admitted at trial").[11] In a robbery case, that it was raining may be significant as to whether the victim got a good look at the robber's face. If there was evidence that shortly after the robbery the victim entered a building with a wet umbrella, the finder of fact could deduce from that wet umbrella that it had been raining. But, the finder of fact could not premise a finding that it was raining on her own personal knowledge that Washington springs are often wet. While, on the basis of my own life experience, I might be willing to hazard the guess that a person who claims to earn, let us say, $60,000 a year probably can devote $12,000 to a support obligation without being rendered destitute, I cannot infer that from the evidence the government has presented. To do so would be to engage in the very speculation the law prohibits. *United States v. Pielago*, 135 F.3d 703, 720 (11th Cir.1998); *United States v. Beckner*, 134 F.3d 714, 719 (5th Cir.1998); *United States v. Leos–Quijada*, 107 F.3d 786, 794 (10th Cir.1997); *United States v. Pinckney*, 85 F.3d 4, 7 (2nd Cir. 1996); *United States v. Villegas*, 911 F.2d 623, 628 (11th Cir.1990), *cert. denied*, 499 U.S. 977, 111 S.Ct. 1625, 113 L.Ed.2d 722 (1991).

The government would counter that Congress intended the word "willful" in 18 U.S.C.§ 228 to be interpreted in the same manner it has been interpreted in statutes which criminalize the failure to pay taxes. Courts, interpreting those statutes, have concluded that the the defendant's actual ability to pay is irrelevant if the government can establish that the defendant dissipated his assets to render himself incapable of paying the taxes that were due. In such a situation, his not paying his taxes is willful. *E.g., United States v. Ausmus*, 774 F.2d 722 (6th Cir.1985); *United States v. Tucker*, 686 F.2d 230 (5th Cir.1982), *cert. denied*, 459 U.S. 977, 103 S.Ct. 314, 74 L.Ed.2d 291 (1982); *United States v. Lewis*, 671 F.2d 1025 (7th Cir.1982). *Compare United States v. Andros*, 484 F.2d 531 (9th Cir.1973) (proof of ability to pay is an essential element of the government's proof of willfulness). Additionally, the government contends that another Circuit court decision, interpreting these tax cases with regard to 18 U.S.C. § 228, has concluded that the government is not required to prove a deadbeat dad's ability to pay his child support obligation in order to convict if he renders himself impoverished. *United States v. Williams*, 121 F.3d 615, 620–621 (11th Cir.1997), *cert. denied*, — U.S. —, 118 S.Ct. 1398, 140 L.Ed.2d 656 (1998) (failure to pay is willful when the defendant tried to "live like a monk" to avoid his financial obligations). Such a person, whose improverishment is a product of his own attempt to evade a legal obligation, can be said to have willfully failed to pay his taxes or support obligation.

Such shenanigans are, of course, familiar to the domestic relation courts who confront what is know as the "Gauguin" problem. The defendant father, a computer programmer or a lawyer in a three piece suit, confronted with a potential support obligation, suddenly decides that, like Gauguin, he always wanted to be a painter and live in the South Seas. He therefore sells everything he has the week before the divorce hearing and trades his suit for a sargon. Confronted with such a transparent attempt to evade his obligation, the court will not hesitate to im-

---

11. "Inferred factual conclusions based on circumstantial evidence are permitted only when, and to the extent that, human experience indicates a probability that certain consequences can and do follow from the basic circumstantial facts." *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.* 637 F.2d 105, 116 (3rd Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981).

pose a support obligation based upon the income he had before his sudden artistic revelation. In this situation, his ability to pay, the product of manipulation of his financial situation, may be irrelevant. It hardly follows from that appropriate judicial reluctance to be trifled with that the courts are in the habit of finding that an ability to pay is irrelevant to willfulness. If is was, the courts would be incarcerating homeless taxpayers and unemployed "deadbeat dads." The government's reliance on these cases for the proposition that the defendant's ability to pay should be irrelevant misunderstands those cases and improperly equates the manipulative defendant with those who may be genuinely unable to pay their support obligations.

■ As to this case, there is insufficient evidence that the defendant dissipated his assets to render himself incapable of paying his support obligations and the government's attempt to equate him with the people who will not work. In 1992 and 1994, he earned no more than $35,000 and that, under District of Columbia law, is deemed an insufficient amount of income to pay a support obligation of $12,000. While his income improved markedly in 1993, 1995 and 1996, there is no evidence in those years that he dissipated his assets to render himself impoverished or arranged his financial affairs so that he could not pay his support obligation because he made other expenditures instead. At most, the government made some noises that the defendant has champagne tastes on a hamburger budget. But that hardly excuses the government's obligation to prove that a reasonable, careful and responsible comparison of his actual income against either his or actual projected expenses establishes beyond a reasonable doubt that he had the ability to pay his support obligation or that his inability was the product of specific, extravagant expenditures on other things.

My insistence upon such proof is perfectly consistent with the legislative history. It is startling how often that history demonstrates that the bill's supporters rejected any intention to jail a person unless the government established his ability to pay. 138 Cong. Rec. S17131 (daily ed. October 7, 1992)

(statement of Sen. Kohl) (intention of insisting that government prove that wilfull failure to pay was to protects against imprisoning parents who are unable to pay the child support); Hearing at 4 (statement of Sen Biden) (not an issue of whether father is able to pay but whether he is willing); *id.* at 47 (Sen. Kohl assured by witnesses, supporting bill, that "you would not support putting men in jail for nonpayment, if in fact, they have no money."). That such sentiments were articulated by the most fervent supporters of the statute underlines why insistence on such proof effectuates the congressional intent in enacting the statute—to put the fear of God (or of the federal government) into those fathers who were perfectly capable of supporting their children but did not.

Additionally, Congress quoted the following language from the decision in *United States v. Poll,* 521 F.2d 329, 333 (9th Cir. 1975) as describing the government's burden to establish willfulness:

> The government must establish, beyond a reasonable doubt, that at the time payment was due the taxpayer possessed sufficient funds to enable him to meet his obligation or that the lack of sufficient funds on such date was created by (or was the result of) a voluntary and intentional act without justification in view of all the financial circumstances of the taxpayer.

H.R.Rep. No. 102–771, at 6 (1992).

The use by Congress of that language, combined with the portions of the legislative history which unequivocally reject any intention to jail parents who cannot pay, clearly establish its intent that a conviction follow only if the government proved either that the defendant was in fact able to pay his support obligation or that he dissipated his assets to render himself unable to pay that obligation. The latter conclusion must be predicated on an analysis of all his financial circumstances which has to mean a comparison of his income against his actual or projected expenses. In this case, the government proved neither that the defendant was in fact able to pay the support obligation nor that a consideration of all his financial circumstances compelled the conclusion that his inability to pay

was a voluntary, intentional and unjustifiable act.

Additionally, insisting on such proof restores the congruence between the statute and domestic relations common law. At the conclusion of the government's case, I expressed my concern that unless the government was held to an obligation to prove the defendant's ability to pay, there would be an incongruence between criminal prosecutions and contempt proceedings. If ability to pay is crucial to contempt proceedings against deadbeat dads but irrelevant to criminal prosecutions, deadbeat dads could go to federal prison even though they could not be held in contempt. Such a result is clearly illogical. I also indicated that insisting upon proof of ability to pay was more consistent with the principle that no one should be incarcerated because he cannot pay a debt.

An examination of D.C. law subsequent to the hearing establishes the incongruence I feared will exist unless the government is held to its obligation to prove the defendant's ability to pay. Beginning with a decision from the Court of Appeals for this Circuit, when this Court was a court of general jurisdiction, D.C. law could not be clearer: in a domestic relations case, a specific finding that the defendant is able to pay the obligation imposed is *sine qua non;* without it, the order commands no obedience. *Lundregan* v. *Lundregan,* 252 F.2d 823, 102 U.S.App. D.C. 259 (1958); *Lewis v. Lewis,* 637 A.2d 70 (D.C.1994); *Garcia v. Andrade,* 622 A.2d 64 (D.C.1993); *Langley v. Kornegay,* 620 A.2d 865 (D.C.1993); *Guyton v. Guyton,* 602 A.2d 1143 (D.C.1992); *Smith v. Smith,* 427 A.2d 928 (D.C.1981); *Truslow v. Truslow,* 212 A.2d 763 (D.C.1965).

### Conclusion

The clarity of the law confirms the vital importance of rejecting any attempt to interpret 18 U.S.C. § 228 to permit a conviction unless the government proves the defendant's ability to pay the support obligation beyond a reasonable doubt. In this case, the government established, at most, what the defendant's income might have been but never established what in fact his disposable income was and what expenses had to be legitimately deducted from that disposable income to allow for the defendant's own subsistence. The government therefore asks me to guess that the defendant had the ability to pay the support obligation. I cannot do that, however, and remain faithful to ascertaining whether the evidence it elicited proved that the defendant's failure to pay his child support obligation was willful because he had the ability to pay it but did not. I therefore will grant the defendant's motion for judgment of acquittal.

An order granting defendant's motion and dismissing this action is issued herewith.