UNITED STATES of America

v.

Douglas A. SATTERLY.

No. 3:97 CR 200(JGM).

United States District Court,
D. Connecticut.

Nov. 17, 1998.

Paul F. Thomas, Federal Public Defender's Office, New Haven, CT, for Douglas A. Satterly, defendant.

Denise Derby, Christine L. Sciarrino, John H. Durham, Barbara Bailey Jongsbloed, U.S. Attorney's Office, New Haven, CT, for U.S.

*MEMORANDUM OF DECISION*

MARGOLIS, United State Magistrate Judge.

On October 22, 1997, the Government filed a one-count information against defendant Douglas A. Satterly, pursuant to 18 U.S.C. § 228, alleging that from about March 1995, defendant willfully and unlawfully failed to pay legal child support obligations for his two minor children, which obligation has remained unpaid for more than one year and is greater than $5,000. On May 5, 1998, defendant entered a plea of not guilty and consented to trial before this Magistrate Judge. (Dkt.è8–9). Both sides filed pretrial memoranda on July 17, 1998. (Dkt.è16–17). A

court trial was held on July 21, 1998, at which three witnesses testified for the Government—David Jaundrill, John Mahaney, and defendant's daughter, Meredith Satterly; defendant testified in his own defense. (Dkt.è19–22). Pursuant to deadlines set by the Court, on August 31, 1998, both sides filed post-trial briefs (Dkt.è23–24) and on September 10, 1998, both sides filed reply briefs. (Dkt.è25–26).

For the reasons stated below, the Court finds that defendant is guilty of these charges.

## I. FINDINGS OF FACT

Defendant Douglas Satterly and Gail Satterly were married in Maryland on November 9, 1974 and had two daughters, Meredith, born April 3, 1980 and Andrea, born December 17, 1984. (Exh. A, Findings of Facts and Conclusions of Law, ¶¶ 2–3). At some point, the Satterly family relocated to a home in St. Thomas, U.S. Virgin Islands, which they owned. (*Id.* ¶¶ 1 & 4). Prior to moving to St. Thomas, defendant had been employed In the sale of imported shoes, earning more than $70,000 in 1986. (*Id.* ¶ 11). Defendant was engaged in the roofing business in the Virgin Islands—in late 1988 or early 1989 he earned a substantial income because of Hurricane Hugo, but by July–August 1990, business had slowed down. (*Id.* ¶¶ 11–12; Tr. 160–62). Gail Satterly filed for divorce in the Territorial Court of the Virgin Islands; a court trial was held on February 7, 1991 and on June 4, 1991, Judge Ishmael A. Meyers issued a Decree and Findings of Fact and Conclusions of Law. (Exh. A). The judge awarded joint legal custody of the daughters, with Gail Satterly having sole physical custody. (*Id.*, Decree ¶ 2; Findings of Fact ¶ 14, Conclusions of Law ¶ 3). The judge also ordered defendant to pay child support for the two children in the amount of $650 payable in semimonthly installments of $325. (*Id.*, Decree ¶ 3 & Conclusions of Law ¶ 10).[1]

In June 1991, Gail, Meredith and Andrea Satterly relocated to Connecticut. (Tr. 109–10, 164). Shortly after that, defendant closed his roofing business. (Tr. 164). On July 24, 1992, the Certified Judgment of Divorce was filed and registered in the Connecticut Superior Court in Bridgeport. (Exh. A, Certification; Tr. 10–11). Defendant paid his child support during 1992 and 1993, although not necessarily on time. (Tr. 80, 81). On September 20, 1994, a clerk from the Manatee County Courthouse in Florida provided the Connecticut Superior Court with a Bradenton, Florida address for defendant. (Exh. K; Tr. 38–40).

Defendant testified that from December 1993 through July 1995, he resided in Novo Humborgo, Brazil, where he operated Satterly International, for which he developed shoes and handbags, had them manufactured in Brazil, and then sold them in the United States; he paid his child support during this period, even though defendant had continuing disputes with his ex-wife over visitation. (Tr. 118–20, 122–25, 126, 130, 155–57, 167).[2] He testified that although annual sales were as high as $500,000 in 1993, he eventually was forced to close the business when the Brazilian currency was grossly revalued, returning to the United States with approximately $1,000 in cash. (Tr. 120, 126–27, 145, 168–70).

In 1995, defendant apparently resided in Sarasota, Florida. (Exh. C). On March 15, 1995, David A. Jaundrill, Support Enforcement Officer, for the Connecticut Superior Court, sent a demand letter to defendant at an address in Zellwood, Florida and two addresses in Sarasota. (Exh. F; Tr. 33–34, 37–38, 41). Defendant responded in a letter, dated April 10, 1995, in which he complained that his ex-wife had denied him visitation with his daughters, explained that he had been traveling extensively, and promised that "payments will continue to be made as al-

---

**1.** The judge further ordered: "Both parties shall be responsible for the children's medical insurance." (Exh. A, Conclusions of Law, ¶ 11). Defendant's oldest daughter, Meredith, had open-heart surgery when she was fifteen-months-old and continues to receive treatment in Boston on a yearly basis; defendant has not contributed towards her medical bills, which total $23,528.10 from 1991 through 1996. (Exh. S; Tr. 111–12).

**2.** Defendant testified: "I haven't seen my girls, except for this morning here, since June of '91." (Tr. 123–24).

ways." (Exh. G; Tr. 34–35, 42–43). Ten days later, Jaundrill sent a letter to defendant, at his Sarasota address, indicating that as of January 1995, the arrearage was $7,774, and that the child support issues were distinct from the visitation issues. (Exh. H; Tr. 35–36, 43). On May 25, 1995, defendant responded in a letter, written on the stationary of the "Admirals Club" and mailed from Queens, New York, in which he questioned the $7,774 arrearage, but promised that "[i]n the future I have no problem sending c[hild] support to state of Conn[ecticut] as requested." (Exh. I; Tr. 36, 45, 60–61). The "Admirals Club" is a special lounge at American Airlines for first class passengers or frequent fliers, to which defendant belonged in 1994 and 1995. (Tr. 44, 187). On June 7, 1995, Jaundrill responded to defendant. (Exh. J; Tr. 36–37). Defendant never contacted Jaundrill thereafter, as defendant claims he never received this letter. (Tr. 45–46, 208–09). There is no dispute that since April 1995 defendant has failed to pay child support, which he described as "a millstone around my neck." (Tr. 110–11, 121–22, 145–46, 207). Defendant testified that at the time he wrote these letters to Jaundrill, he did intend to pay child support. (Tr. 122).

From July 1996 through January 1997, defendant lived in Longboat Key, Florida;[3] he earned about $2,000 working in advertising for the Florida Directory and unsuccessfully attempted to start a shoe business in Mexico, with funds he borrowed from a friend. (Tr. 130, 132, 172–73, 174–75, 178–79). During this period, his wife, Mara R. Kelsch (see Exh. E), had "a couple of part-time jobs," including work at a retail store and telemarketing, which supported them. (Tr. 131, 133–34, 177–78).[4] He testified that he "[c]onstantly" sought employment in retail sales, but failed, in part, because he was overqualified. (Tr. 175–76).

In February 1997, defendant and his wife relocated to Hilton Head, S.C., when his wife was promoted as manager for a store operated by Mondi of America; he testified that all their belongings fit into his wife's leased car. (Exh. E; Tr. 141–43, 188–90). In July 1997, defendant and his wife moved to an apartment in Duluth, Georgia, after his wife was promoted to a large store in Atlanta. (Exhs. D–E; Tr. 146). In the rental application form, defendant was described as "self-employed." (Exh. E). The application form further indicated that Kelsch earned $2,400 a month as a manager for Mondi of America. (Exh. E; Tr. 58, 190). Defendant testified that they survived on his wife's income. (Tr. 146, 191, 193). During the Christmas season, he was a part-time sales clerk at a Coach store for $7.00 an hour, earning approximately $1,000 over six to eight weeks. (Tr. 147, 195–96). At the time of the trial, defendant was still residing with his wife in Georgia. (Tr. 148).[5]

Over the course of his investigation, Jaundrill uncovered these multiple addresses for defendant in various locations in Florida, South Carolina, and Georgia. (Tr. 40–41). In investigating approximately 2400 support cases, Jaundrill has observed that it is not uncommon for delinquent child support obligors to change their addresses frequently (Tr. 47, 48–49) and that it is particularly difficult to trace assets of self-employed individuals. (Tr. 49; see also Tr. 100–01). Defendant denied that his moves reflected an intent to avoid his child support obligations and that if he had so intended, he would have remained in Brazil. (Tr. 148). When asked if he had any assets, defendant responded: "None. Not a thing." (Tr. 149).

In his investigation, Jaundrill discovered that defendant has an active account at Merrill Lynch Pierce, Fenner & Smith Inc.

---

3. Defendant testified that from July 1995 through February 1996, he and his wife lived rent-free with a friend in Longboat Key, Florida. (Tr. 128–29, 133, 172–73). He further testified that he and his wife lived in a one-bedroom apartment in Holmes Beach, Florida from February 1996 through August 1996. (Tr. 129–30, 177–78). He testified that in August 1996, he and his wife returned to Longboat Key, where they resided at their friend's home, this time paying him

approximately $525 in monthly rent. (Tr. 132–33).

4. Defendant met his wife in Brazil in May 1993, and they were wed in August 1994. (Tr. 153–54).

5. Shortly after the trial, however, he moved to Bradenton, Florida.

[ "Merrill Lynch" ], with assets worth $4,917.03 as of December 31, 1997; defendant's address with the stockbroker is in St. Thomas, V.I. (Exh. L; Tr. 46–47). Defendant testified that he was unaware of this account, which had been opened as an IRA, until the morning of the trial. (Tr. 127–28, 158–59). Jaundrill further testified that had defendant indicated an inability to pay his arrearage, he would have advised defendant to seek a modification in the Connecticut Superior Court.[6] (Tr. 54–55, 59, 74–77). On July 9, 1998, Jaundrill prepared a report regarding defendant's delinquency. (Exh. B; Tr. 8–9, 15–19).[7]

From June 1992 through April 1995, defendant sent various letters to his daughters, in which he mentioned his extensive traveling. (Exhs. U, V, X, Y, Z, AA). Three letters, the most recent in May 1995, were written on stationery from the Park Lane Hotel in New York City or the Admirals Club. (Exhs. X, AA, BB). From time to time, he expressed hostility with his ex-wife over the visitation issues, and sometimes at his daughters as well. (Exhs. V, Y, AA). In his April 8, 1995 letter, he wrote, referring to the Brazilian business:

> My business life is lousy, business is very bad for the last 6 months and will continue to all of 1995. Out of my control, so money has been and will continue to be a problem, just paying the support payments is a continuous struggle. I know I've been late at times but only because I had *no* money. I don't pay you on time because I have no money to send. No other reason and to think otherwise is a mistake.

(Exh. AA (emphasis in original); *see also* Tr. 120–21).[8] In his May 25, 1995 letter, postmarked from Queens, New York, he wrote: "I can't send you $200 until 2 weeks from now. I hope it is not too late but best I can

do—I don't have much —as explained in last letter." (Exh. BB).[9]

Between July 1995 and April 1997, defendant took approximately thirty international flights, usually flights between Dallas or Atlanta and Mexico City, Mexico or Guadalajara, Mexico; twelve of these flights included overnight trips returning to the U.S. (Exhs. M–N, P; Tr. 84–85, 86–89, 182–86). He gained 233,982 frequent flier miles from American Airlines from these flights. (Exh. N; Tr. 85–86). Defendant applied 80,000 of these miles towards his membership in the Admirals Club. (Exh. O; Tr. 86, 187). According to FBI Special Agent John M. Mahaney, who has experience in financial investigations, it is difficult to track assets that are concealed outside the United States. (Tr. 82–83, 101–02). Defendant has an interest in a Florida corporation, Satterly International, which owns the trade name, "TerraBlues" for leather goods, registered in March 1995. (Exh. Q; Tr. 92–93, 94–96, 170–71).

Defendant explained that on November 21, 1996, he entered into a written contract with Meldisco, a New Jersey business, in which he was paid $350 per day, plus travel and daily expenses, to perform quality control inspections at Meldisco's two shoe factories in Mexico, approximately twice a month; the flights were related to this contract and all travel arrangements were made, and paid for, by Meldisco. (Exh. 1; Tr. 134–39, 149, 179–81). Defendant described this job as "a gift from heaven." (Tr. 179). The frequent flier miles were derived from flights on Delta Airlines or American Airlines. (Tr. 139–40). In 1996, defendant earned $873.02 from Meldisco, and $4700 in 1997. (Tr. 140–41, 181–82). While in Mexico, defendant again attempted to institute his own shoe business, but he again failed, when he was unable to fill orders. (Tr. 137–38, 143–45).

---

6. Jaundrill testified on cross-examination that the Connecticut Child Support Guidelines permit net deductions for taxes, union dues, medical insurance, day care, and other child support orders, but not for rent, auto, insurance and utilities. (Tr. 52–54).

7. The specific amount of the delinquency was never established at trial; defendant does not dispute, however, that the amount exceeds $5,000.

8. As Jaundrill observed, in his April 10, 1995– letter to Jaundrill, defendant made no such complaints. (Exh. G; Tr. 72–73).

9. As Jaundrill similarly observed, in Exh. I, written on the same day on Admirals Club stationery, defendant represented that "[i]n the future I have no problem sending c[hild] support ... as requested." (Exh. I; Tr. 74).

Defendant maintains a Visa credit card, which he uses for relatively small items. (Exh. CC; Tr. 96, 98–100, 192–93, 193–95). Special Agent Mahaney testified that defendant failed to file any federal tax returns for 1996 and 1997. (Exh. DD; Tr. 101, 104–06). Defendant testified, however, that a joint return was filed for 1996, and that he had obtained an extension for 1997. (Tr. 147, 157–58). Special Agent Mahaney was unable to locate any assets of defendant, other than the Merrill Lynch account. (Tr. 103–04).

Defendant acknowledged that he could have paid a nominal monthly amount, such as a few dollars, towards child support, but more than $5,000 would have remained unpaid. (Tr. 149–50). Defendant further testified that he had not known about modification of child support, but that even if he had, he might not have availed himself of the opportunity—"I want to be able to honor the debt that I owe my children. I'm not looking for a legal way out." (Tr. 150–51. *See also* Tr. 201–02, 206–07, 207–08). Defendant testified that he could not afford private counsel to represent him in his domestic matters. (Tr. 208–09). He further testified that he hoped to start a business, because he could not pay $650 a month in child support by working as a sales clerk for $7.00 per hour. (Tr. 150, 201–02). He contended that he has been unable to find full-time employment in retail. (Tr. 202–03). He indicated that he still intends to fulfill his obligations, possibly by the end of 1998, and recently started a shoe business in Hong Kong, for which the "[p]rospects are very good." (Tr. 151–53, 197–200, 205–06).

Defendant utilized his frequent flier miles for his airplane trips to Connecticut in May and July in connection with this prosecution. (Tr. 203–04). For his trial, he rented from Bradley Airport "[t]he cheapest" car he could find and stayed at the Duncan Hotel in downtown New Haven, a particularly undesirable location. (Tr. 204–05, 209–11).

## II. CONCLUSIONS OF LAW

Under the Child Support Recovery Act of 1992 ["CSRA"], a person "[w]ho willfully fails to pay a past due support obligation with respect to a child who resides in another State" is guilty of a misdemeanor. 18 U.S.C. § 228(a).

> [T]he term "past due support obligation" "means any amount—
>
> (A) determined under a court order ... pursuant to the law of a State to be due from a person for the support and maintenance of a child ...; and
>
> (B) that has remained unpaid for a period longer than one year, or is greater than $5,000.

Section 228(d)(1). "State" includes "any ... commonwealth, possession or territory of the United States." Section 228(d)(2). *See generally United States v. Sage*, 92 F.3d 101 (2d Cir.1996), *cert. denied*, 519 U.S. 1099, 117 S.Ct. 784, 136 L.Ed.2d 727 (1997) (upholding constitutionality of CSRA).

■ The parties agree that there are four elements to this offense: (1) that the Connecticut Superior Court ordered defendant to pay child support for his two children; (2) that defendant's children reside in Connecticut and defendant resides in another state; (3) that defendant has willfully failed to pay the child support obligations as ordered by the Connecticut Superior Court; and (4) the unpaid child support exceeds $5,000 and has remained unpaid for more than one year. *See also United States v. Mathes*, 151 F.3d 251, 252–53 (5th Cir.1998); *United States v. Mattice*, 22 F.Supp.2d 49, 51 (W.D.N.Y.1998). The only dispute here is whether defendant has willfully failed to pay his child support obligations.

■ The element of "willfulness" was discussed in considerable detail in *United States v. Williams*, 121 F.3d 615 (11th Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1398, 140 L.Ed.2d 656 (1998), as follows:

> The operative language establishing the requisite intent under [the CSRA] is "willfully fails to pay." This language has been borrowed from the tax statutes that make willful failure to collect or pay taxes a Federal crime, 26 U.S.C. §§ 7202, 7203. Thus, the willful failure standard of [the CSRA] should be interpreted in the same manner that Federal courts have interpreted these felony tax provisions. In order to establish willful-

ness under those provisions, the government must establish, beyond a reasonable doubt, that at the time the payment was due the taxpayer possessed sufficient funds to enable him to meet his obligation or that "the lack of sufficient funds on such date was created by (or was the result of) a voluntary and intentional act without justification in view of all of the financial circumstances of the taxpayer." ... The Committee intends that the willful failure standard of [the CSRA] be given similar effect as the willful failure standard contained in these tax felony provisions.

In light of the Committee Report, and the similarity between the CSRA and the tax statutes that criminalize willful failure to pay money, we conclude it is proper to rely on cases construing the intent element in those tax statutes when construing the CSRA's willfulness standard.

"Willfulness, as construed by our prior decisions in criminal tax cases, requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." Our focus in this case is on the third element, which is typically met by proving that the defendant had the ability to fulfill his obligation and refused to do so. Here, Appellant lacked the ability to do so, but his inability was due to purposeful acts taken specifically to deprive him of his ability to pay his child support obligations.... [W]illfulness can be proven if "the lack of sufficient funds on such date was created by (or was the result of) a voluntary and intentional act without justification in view of the financial circumstances of the taxpayer." The reasonableness of this rule is obvious: "[o]therwise, a recalcitrant taxpayer could simply dissipate his liquid assets at or near the time when his taxes come due and thereby evade criminal liability."

121 F.3d at 620–21 (*citing* H.R.Rep. No. 102–771, at 6 (1992) & *United States v. Poll*, 521 F.2d 329, 333 (9th Cir.1975)) (other citations omitted). *See also Mathes*, 151 F.3d at 252;

*United States v. Holbrook*, 15 F.Supp.2d 10, 16–18 (D.D.C.1998).[10]

In the limited published decisions construing "willfulness" under CSRA, the issue is not a difficult one. For example, the "deadbeat dad" in *United States v. Crawford*, 115 F.3d 1397, 1398–99 (8th Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 341, 139 L.Ed.2d 264 (1997), was an emergency room physician who had earned more than $230,-000 during the relevant time period. The Eighth Circuit concluded that such evidence was "ample ... to support the inference that Crawford voluntarily and intentionally violated a known legal duty to pay past due child support." 115 F.3d at 1407.

The defendant-father in *Williams* was a pathologist who was ordered to pay $750 per month for child support for his two sons; when he testified in open court that he did not intend to pay such obligations and would prefer to live without funds in a monastery, the state court ordered him to remain employed as a physician. Three weeks after such court order, he quit medicine and held some odd jobs, including traffic counter, handyman at the abbey where he lived, substitute teacher, and telephone surveyor; eventually he lived and worked at a YMCA. His child support obligations exceeded $39,-000. 121 F.3d at 616–18. The Eleventh Circuit upheld defendant's conviction:

The record provides ample support for the district court's finding of willfulness. Appellant made numerous threats to quit his job as a pathologist and to live "like a monk." This unilateral decision deprived Appellant of the means to satisfy his child support obligation. Thus, although Appellant lacks the funds to pay, it is due solely to his decision to take steps specifically calculated to eliminate his ability to do so. His situation is no different than if he had taken his money and given it away, spent it, or otherwise disposed of it: Appellant's inability to pay is due to his own purposeful actions and therefore cannot constitute a defense to the charge.

... In light of his past threats to quit his job to avoid complying with the State

---

**10.** Ironically, the *Holbrook* decision was filed on the same day as this trial.

Court's orders and his repeatedly expressed view that he should not have to support his children because they were in his ex-wife's custody, the district court was entitled to conclude that he left the medical field and took relatively low paying jobs with the specific purpose of making it impossible for him to pay child support. Appellant's conduct easily qualifies as willful failure to pay as defined by the CSRA. *Id.* at 621–22.

In *Holbrook*, Magistrate Judge Facciola characterized actions such as those taken by Williams as the " 'Gauguin' problem":

> Such shenanigans are, of course, familiar to the domestic relation courts who confront what is know[n] as the "Gauguin" problem. The defendant father, a computer programmer or a lawyer in a three piece suit, confronted with a potential support obligation, suddenly decides that, like Gauguin, he always wanted to be a painter and live in the South Seas. He therefore sells everything he has the week before the divorce hearing and trades his suit for a sargon. Confronted with such a transparent attempt to evade his obligation, the court will not hesitate to impose a support obligation based upon the income he had before his sudden artistic revelation. In this situation, his ability to pay, the product of manipulation of his financial situation, may be irrelevant. It hardly follows from that appropriate judicial reluctance to be trifled with that the courts are in the habit of finding that an ability to pay is irrelevant to willfulness. If i[t] was, the courts would be incarcerating homeless taxpayers and unemployed "deadbeat dads."

15 F.Supp.2d at 17–18. Holbrook had been ordered by the New York court to pay $1,000 a month to support his son; he had earned $60,000 to $75,000 as the owner of a restaurant. He eventually owed his ex-wife $63,000 in back child support. *Id.* at 11–12. He later gained employment as a realtor, for which he earned commissions, with the following income: $35,650 in 1992, $54,328 in 1993 (and unemployment compensation in the amount of $6,900), $24,942 in 1994, $51,003 in 1995, and $66,200 in 1996. *Id.* at 15–16. For two of these years—1992 and 1994—his income fell considerably beneath the $60,000 anticipated by the New York court and beneath guidelines used in the District of Columbia courts. *Id.* at 16.

Magistrate Judge Facciola held the Government had not sustained its heavy burden:

> As to this case, there is insufficient evidence that the defendant dissipated his assets to render himself incapable of paying his support obligations and the government's attempt to equate him with the people who will not work. In 1992 and 1994, he earned no more than $35,000 and that, under District of Columbia law, is deemed an insufficient amount of income to pay a support obligation of $12,000. While his income improved markedly in 1993, 1995 and 1996, there is no evidence in those years that he dissipated his assets to render himself impoverished or arranged his financial affairs so that he could not pay his support obligation because he made other expenditures instead. At most, the government made some noises that the defendant has champagne tastes on a hamburger budget. But that hardly excuses the government's obligation to prove that a reasonable, careful and responsible comparison of his actual income against either his or actual projected expenses establishes beyond a reasonable doubt that he had the ability to pay his support obligation or that his inability was the product of specific, extravagant expenditures on other things.
>
> My insistence upon such proof is perfectly consistent with the legislative history. It is startling how often that history demonstrates that the bill's supporters rejected any intention to jail a person unless the government established his ability to pay. That such sentiments were articulated by the most fervent supporters of the statute underlines why insistence on such proof effectuates the congressional intent in enacting the statute—to put the fear of God (or of the federal government) into those fathers who were perfectly capable of supporting their children but did not.
> . . .

The ... legislative history ... unequivocally reject[s] any intention to jail parents who cannot pay, clearly establish[es] its intent that a conviction follow only if the government proved either that the defendant was in fact able to pay his support obligation or that he dissipated his assets to render himself unable to pay that obligation.... In this case, the government proved neither that the defendant was in fact able to pay the support obligation nor that a consideration of all his financial circumstances compelled the conclusion that his inability to pay was a voluntary, intentional and unjustifiable act.

*Id.* at 18–19 (multiple citations omitted). In fact, the Magistrate Judge commented, "This defendant is so unlike the archetype of the 'deadbeat dad' that Congress posited that the decision to prosecute him is puzzling." *Id.* at 14.[11]

Two recent decisions, however, have shifted the focus of "willfulness" to a defendant's acknowledgment that he was capable of some child support payment, but not necessarily the one ordered by the court. In *Mathes*, the defendant-father had been ordered to pay $500 per month in child support for his two children; since the divorce, he had been frequently unemployed, unable to work for several months due to an injury, and incarcerated for one year, resulting in a child support arrearage of $19,000. 151 F.3d at 252. However, Mathes admitted at trial that, during the period alleged in the indictment, he could have paid some amount toward his support obligation. During direct examination by defense counsel, Mathes testified as follows:

Q: Mr. Mathes, do you have the ability to pay over $20,000 and support your current family?

A: No way.

Q: Do you have the ability to pay anything in excess over what it takes to support your current family?

A: Some.

Q: How much?

A: I really don't know. There is some money left over from the bills that I pay, the earnings that I make, and then I pay the bills. Yes, there is some money left over, but not $500 a month. Way under that.

*Id.* at 254. Given this testimony, the Fifth Circuit affirmed defendant's conviction under CSRA:

We conclude that Mathes's acknowledgment that he could have paid some amount toward his past due support obligation precludes his financial condition from serving as a bar to criminal liability. Mathes's interpretation of the CSRA as requiring proof beyond a reasonable doubt that, during the period alleged in the indictment, the defendant had the ability to pay the entire amount of past due child support owed possesses no basis in the language of the statute. The CSRA defines "support obligation" to include "any amount ... determined under a court order ... to be due from a person for the support and maintenance of a child ... that has remained unpaid for a period longer than one year." 18 U.S.C. § 228. Mathes's legal obligation to pay Mayers approximately $20,000 in child support arrearages necessarily encompassed an obligation to pay any lesser-included amount that Mathes was capable of paying. Thus, while Mathes may not have willfully failed to pay the full amount of child support arrearages that he owed, he could have willfully failed to pay the lesser amount that he was capable of paying; that lesser amount fits the CSRA's definition of support obligation, which includes any amount due pursuant to court order that has remained unpaid for longer than a year.

Were we to conclude otherwise, child support obligors would be able to insulate themselves from criminal liability by simply failing to make child support payments until the total amount past due is an amount that they are incapable of paying in one lump sum. Construing the CSRA so that it creates such a perverse incentive

11. The Government, for example, presented evidence that Holbrook drove a Jaguar, but it was a 1989 model. *Id.* at 16.

for extended nonpayment would surely flout Congress's purpose for enacting the statute: to remedy "the growing problem of interstate enforcement of child support by punishing certain persons who intentionally fail to pay their child support obligations." H.R.REP. NO. 102–771, at 4 (1992). We therefore conclude that Mathes's financial condition did not preclude the district court from finding beyond a reasonable doubt that he willfully failed to pay a past due support obligation. *Id.*

Similarly, the defendant-father in *Mattice* had been ordered to pay $240 per month for child support of his three children; he eventually owed more than $55,000 in child support arrears. 22 F.Supp.2d 49, 51–52, 53. Defendant had earned more than $19,000 in 1996 and $18,000 in 1997. *Id.* at 52–53. Magistrate Judge Feldman rejected Mattice's claim that his failure to pay child support obligations in 1996 and 1997 was not willful because of an inability to pay such child support payments. While the judge acknowledged that defendant was "certainly not wealthy" and "the defendant may have been unable to pay all the past-due arrears, he was certainly able to contribute to his then due and owing child support obligations." *Id.* at 52–54. Relying heavily upon the *Mathes* decision, Chief Judge Larimer, to whom the appeal was taken, upheld the conviction:

> Therefore, defendant's inability to pay the full $55,000 during the period alleged in the indictment did not preclude Judge Feldman from finding that defendant willfully failed to pay a past due support obligation. The evidence at trial sufficiently demonstrated that defendant had the means to pay at least some amount toward his child support obligation, and, instead, he paid nothing. This certainly constitutes a violation of the statute.

*Id.* at 53–54.

The facts here present a more difficult situation than those found in the *Crawford* and *Williams* decisions. Defendant is clearly unlike the wealthy emergency room physician in *Crawford,* and his inaction in finding meaningful gainful employment is nowhere as egregious as the pathologist-turned-monk in *Williams.* While the defendant in *Holbrook* earned significantly more money in real estate commissions than defendant here, there was no clear evidence as to how defendant would have been treated if he had sought modification of his child support obligations in the Connecticut Superior Court, in contrast to the situation in *Holbrook.*

To the extent that defendant has a " 'Gaugin' problem," it is due to defendant pursuing his pipe dream of running his own imported shoe business, either Satterly International or Terra Blues, businesses which have failed on at least two occasions—in Brazil in 1993–95, and in Mexico while employed with Meldisco. (Tr. 120, 126, 145, 130, 132, 137–38, 143–45, 178–79). As of the time of the trial, he still was pursuing that dream, this time in Hong Kong. The only times defendant was successful in the imported shoe business were in 1986 (predating his family's relocation to St. Thomas) when he earned more than $70,000, and in 1993, when annual sales in Brazil were as high as $500,000. By his own admission, he has lost money on these ventures in the last five years. Defendant testified that he hoped to start his own business, because he could not pay $650 a month in child support by working as a sales clerk for $5.00 to $7.00 per hour. (Tr. 150, 201–02). He testified that he "[c]onstantly" tried to find full-time employment in retail stores (department and otherwise) but was unsuccessful because "they weren't hiring[,][t]hey didn't like me," or "[t]hought I was too qualified to be . . . trying to sell shoes when you know how to manufacture them." (Tr. 175–77, 202–03).[12]

Like the defendant in *Holbrook,* defendant is hardly· a "poster child" for "deadbeat dads." Since their return to the United States in 1995, defendant and his new wife have "lived very lean." (Tr. 178). When defendant and his wife relocated to Hilton Head, S.C., all their belongings fit into his

---

**12.** The Government presented no evidence in rebuttal regarding the number of jobs in the

Atlanta area for which defendant was qualified.

wife's leased car. (Tr. 142). Although defendant maintains a Visa credit card, he only uses it for relatively small items. (Exh. CC; Tr. 96, 98–100, 192–93, 193–95). Defendant earned $2,000 in Florida selling advertising for the Florida Directory, $1,000 in Georgia working as a part-time sales clerk in a Coach store, $873.02 in 1996 and $4700 in 1997 from the contract with Meldisco. (Tr. 131, 173, 175, 147, 195–96, 140–41, 181–82). Defendant and his wife have survived largely based upon her salary, either with multiple part-time jobs or her full-time job as a store manager. (Tr. 146, 191, 193). Defendant has no assets, outside of the Merrill Lynch IRA account, of which he learned on the day of trial. (Exh. L; Tr. 149, 127–28, 158–59). Defendant's international flights during 1995 to 1997 are attributable to his employment with Meldisco and do not reflect "champagne tastes on a hamburger budget." *Holbrook,* 15 F.Supp.2d 10, 18–19. In addition, while relocating from location to location fits a common profile for "deadbeat dads" (Tr. 47, 48–49), it is clear that defendant moved often to follow his wife's career. As defendant candidly acknowledged, "if I was going to avoid paying child support payments I would have stayed in Brazil." (Tr. 148). When he traveled to New Haven for this trial, he stayed in a very inexpensive, and particularly undesirable, hotel. (Tr. 209–11).

Like the defendant in *Mathes,* defendant acknowledged that he could have paid a nominal monthly amount, such as a few dollars, toward child support. (Tr. 149–50). Mathes, like defendant here, had a checkered employment track record—Mathes frequently was unemployed, was unable to work for months due to an injury, and even was imprisoned for a year. 151 F.3d at 252. However, even a modest income, such as $5.00 to $7.00 per hour, would have contributed toward a modest monthly payment of child support. Defendant testified that he had not known about his opportunity to seek modification in the Connecticut Superior Court, that he could not afford to retain private counsel for such matters, and that he might not have availed himself of that opportunity. (Tr. 150–51, 201–02, 206–07, 207–08, 208–09). As a result, this case strongly resembles

*Mathes,* in that "while [defendant] may not have willfully failed to pay the full amount of child support arrearages that he owed, he could have willfully failed to pay the lesser amount that he was capable of paying." 151 F.3d at 254. The Fifth Circuit's analysis in *Mathes* is equally true here:

Were we to conclude otherwise, child support obligors would be able to insulate themselves from criminal liability by simply failing to make child support payments until the total amount past due is an amount that they are incapable of paying in one lump sum. Construing the CSRA so that it creates such a perverse incentive for extended nonpayment would surely flout Congress's purpose for enacting the statute: to remedy "the growing problem of interstate enforcement of child support by punishing certain persons who intentionally fail to pay their child support obligations." H.R.REP. NO. 102–771, at 4 (1992). We therefore conclude that Mathes's financial condition did not preclude the district court from finding beyond a reasonable doubt that he willfully failed to pay a past due support obligation.

*Id.* The conclusion reached in *Mattice,* a decision rendered by a district judge within this Circuit, is consistent with *Mathes* .

In conclusion, defendant Satterly is not the conniving mastermind portrayed by the Government, and is a far cry from the deliberately callous fathers in *Crawford* and *Williams,* who denied their children the financial benefit of lucrative, or once lucrative, medical careers. In his frequent moves within the last three years, defendant Satterly has not attempted to evade his child support responsibilities; instead he is a parasitic drifter, following the fortunes of his new wife's career. Defendant Satterly instead is an unfocused entrepreneur, who dreams of establishing his own imported shoe business, although he has not been continuously successful in such enterprise since before 1986. He testified that he has not been able to find meaningful full-time employment in retail sales, but apparently will not condescend himself by taking lower paying retail jobs, which pay $5.00 to $7.00 per hour. While the Court has been willing to give defendant the benefit of

the doubt regarding much of his testimony, the Court cannot credit his testimony that he did not realize that he could send his children a sum smaller than $650 per month or that he had options in the Connecticut Superior Court to seek a modification. A father who is truly concerned about his children's welfare would manage to send something, even a modest amount, to his children, since March 1995; defendant admitted that he could have forwarded at least a nominal figure. As the Fifth Circuit held, "while [defendant] may not have willfully failed to pay the full amount of child support arrearages that he owed, he could have willfully failed to pay the lesser amount that he was capable of paying." *Mathes*, 151 F.3d at 254.

## III.  CONCLUSION

Accordingly, for the reasons stated above, the Court finds defendant guilty of the charge in the one-count information, filed October 22, 1997, alleging a violation of 18 U.S.C. § 228.