United States Court of Appeals,

Eleventh Circuit.

No. 96-3099.

UNITED STATES of America, Plaintiff-Appellee,

v.

Daniel WILLIAMS, Jr., Defendant-Appellant.

Sept. 8, 1997.

Appeal from the United States District Court for the Middle District of Florida. (No.94-172-Cr-Orl-19), Patricia C. Fawsett, Judge.

Before CARNES, Circuit Judge, and HENDERSON and GIBSON[*], Senior Circuit Judges.

GIBSON, Senior Circuit Judge:

Appellant challenges his conviction on one count of willfully failing to pay child support in violation of the Child Support Recovery Act (CSRA), 18 U.S.C. § 228 (1994). We affirm.

*I. BACKGROUND*

Appellant and his wife were married in May 1979. One son (Jason) was born in September 1980. The couple adopted a second son (Joshua), who was born in March 1988. Sadly, the Appellant and his wife separated in October 1989; evidence at trial demonstrates that Appellant's change in religious beliefs represented a substantial contribution to the couple's difficulties. At the time, the couple lived in Melbourne, Brevard County, Florida. Appellant had graduated from Vanderbilt Medical School and was board certified in anatomic pathology, clinical pathology and blood banking; he was employed as a pathologist at Space Coast Pathology and served as the Associate Medical Examiner for Brevard County.

Formal separation proceedings were commenced in State Court. On December 16, 1989,[1] the State Court ordered Appellant to pay child support in the amount of $750 per month. He did not

_____

[*]Honorable Floyd R. Gibson, U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

[1]The Order was signed on December 16, 1989, but a handwritten notation from the judge indicates his instruction that the date be changed *nunc pro tunc* to October 5, 1989—the date the hearing was held.

comply with this Order. He stated repeatedly, both to his wife and in open court, that he did not plan to pay any child support and believed that the custodial parent (in this case, his wife) should be entirely responsible for the support of the children. He also threatened to quit his job and go live in a monastery in order to insure that none of his earnings were used to pay child support. These threats resulted in an April 3, 1990 Order from the State Court directing that Appellant "stay employed as a physician."

Appellant abided by the State Court's Order to remain employed as a doctor—for approximately three weeks. On April 25, the State Court issued an Income Deduction Order that garnished Plaintiff's wages to pay the past-due child support. On the same day the Income Deduction Order was issued, Appellant voluntarily quit his job and took a job as a traffic counter. A final divorce decree was issued on June 12, 1990; in it, the State Court noted Appellant's threats and his present employment situation but found that Appellant had "demonstrated the ability to earn in excess of $7,000.00 per month" and calculated Appellant's child support obligations accordingly.

In July 1990 Appellant moved to Phoenix, Arizona, and initially earned a living by doing domestic chores at the abbey where he lived. He supplemented his income by working as a substitute teacher and a telephone surveyor. That same month, the State Court imposed a trust on Appellant's pension plan and required the proceeds be applied towards the past-due child support. At that time, Appellant's total arrearage exceeded $9,000, $3,000 of which represented past-due child support. In its Order, the State Court noted that Appellant "testified that he intends to allow his medical license to lapse in spite of the need to make the Court ordered child support payments and that he does not intend [to] pursue any employment in medicine. He does not believe that he will be able to make the payments "leading [sic] life as a monk.' "

In March 1991 the State Court held a contempt hearing. Appellant participated in the hearing by telephone; prior to the hearing[2] Appellant sent a letter to the State Court in which he

_____

[2]The letter (Government's Exhibit 2) is dated February 8, 1990. However, its reference to the March 1, 1991 hearing to other events known to have taken place after February 1990 suggests that the date is an inadvertent mistake and that it was actually written in February 1991 in

2

stated that he was no longer living in the monastery. He also declared that he was unable to pay the "excessive" child support "in light of the fact I shall never again practice pathology." The State Court found Appellant to be in contempt for failing to pay child support.

In May 1991 Appellant left the jobs he had held and began working at the YMCA where he lived. His wages were garnished for five months at the end of 1992 and the beginning of 1993, netting monthly payments of $14 per month towards Appellant's child support obligation.

The State Court conducted contempt proceedings again in May 1993. Prior to the hearing (which Appellant did not attend), Appellant sent a letter to his ex-wife proposing a settlement of all outstanding issues. He proposed that he be absolved of his obligation to pay past and future child support and maintenance and for recision of an arrest warrant (arising from the March 1991 contempt proceedings), shared residential custody of the children, and that the children be encouraged to correspond with him. With respect to the support of the children, he proposed that his "only financial support for the children shall be incurred when [the children] are actually living with me. That is, when the boys live with you, you are financially responsible for their well being. Similarly, when they live with me I shall be financially responsible for their welfare." Appellant also sent a letter expressing similar sentiments to the State Court. The State Court found Appellant to be in contempt of Court; at the time, Appellant's past-due support obligation exceeded $39,000.

The record contains numerous other letters written by Appellant. These letters generally reiterate his intention to never return to the medical field, emphasize his relatively meager earnings, and request reconsideration of prior State Court orders. They also contain quotes from the Bible and other religious sentiments; a common theme appears to be Appellant's belief that his ex-wife violated their marriage vows and religious principles by obtaining the divorce. Appellant's letters also express his belief that she has already received more money than she is entitled to. Appellant has made good on his promise to stay out of the medical field; he has not even attempted to reenter the profession and has not taken any other job that earns much beyond minimum wage.

anticipation of the March 1991 contempt hearing.

3

In December 1994, Appellant was charged with one count of willfully failing to pay a past due support obligation. Appellant consented to trial before a magistrate judge.[3] Evidence at trial demonstrated that Plaintiff had never voluntarily paid any money toward his support obligation; all money credited towards that obligation had been the result of court orders, garnishments, and interceptions of his federal income tax refunds. He testified that he had insufficient means to pay his support obligations, and barely earned enough to survive. Recognizing that the crux of the case hinged on his decision not to work in the medical field, Appellant testified as to his reasons for leaving that profession. He explained that he left the medical field because "[a]t that time, it seemed very unlikely that I could come to a compromise with my wife on salvaging the marriage and I chose to do something else with my life. If the divorce was not to be contested successfully, that I would choose another career." R:2-154. He also testified that he had wanted to leave the medical field on several occasions, but had never done so because it "wasn't a good time to leave." At the time of trial, Appellant's past-due child support obligations totaled in excess of $75,000.

The Magistrate Judge concluded Appellant was guilty of the crime charged, and Appellant appealed this decision to a District Judge.[4] In addition to challenging the Magistrate Judge's conclusion that he had acted willfully, Appellant challenged (for the first time) the CSRA's constitutionality under both the Commerce Clause and the Tenth Amendment. Appellant's conviction was affirmed, and he then initiated the instant appeal.

## II. DISCUSSION

### A. Constitutionality of the Child Support Enforcement Act

28 U.S.C. § 228(a) declares that "[w]hoever willfully fails to pay a past due support obligation with respect to a child who resides in another State shall be punished" as set forth elsewhere in the statute. A "past due support obligation" is any sum ordered pursuant to a state law

---

[3]The Honorable Donald P. Dietrich, United States Magistrate Judge for the Middle District of Florida.

[4]The Honorable Patricia A. Fawsett, United States District Judge for the Middle District of Florida.

requiring payment for the support and maintenance of a child (or a child and parent living together) that is either greater than $5,000 or has been unpaid for more than one year.  28 U.S.C. § 228(b). Appellant contends that Congress exceeded its authority under both the Commerce Clause and the Tenth Amendment.  We address these arguments in turn, mindful that Appellant's failure to raise these issues at trial reduces our review to a search for plain error;  however, there is "no plainer error than to allow a conviction to stand under a statute which Congress was without power to enact.  In essence, the statute was void *ab initio,* and consequently, the district court below lacked subject matter jurisdiction with respect to that charge."  *United States v. Walker,* 59 F.3d 1196, 1198 (11th Cir.), *cert. denied,* --- U.S. ----, 116 S.Ct. 547, 133 L.Ed.2d 450 (1995).

*1. Commerce Clause*

The Commerce Clause, U.S. Const. art.  I, § 8, empowers Congress to "regulate Commerce ... among the several States ...."  Relying principally on *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), Appellant contends the CSRA exceeds Congress' authority. To the contrary, we believe that the CSRA easily falls within the bounds of permissible legislation described by *Lopez*.

*Lopez* involved a challenge to the Gun-Free School Zones Act of 1990, which forbade "any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone."  514 U.S. at 550, 115 S.Ct. at 1626.  The Supreme Court confirmed that there are three broad areas that fall within the Commerce Clause's jurisdictional grant:

> First, Congress may regulate the use of the channels of interstate commerce.  Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities.  Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, i.e., those activities that substantially affect interstate commerce.

*Lopez,* 514 U.S. at 556, 115 S.Ct. at 1629-30  (internal citations omitted).  Appellant bases his arguments on the third category and contends that his child support obligations do not substantially affect interstate commerce.  However, *Lopez*'s third, " "affecting commerce' test was developed in

5

our jurisprudence to define the extent of Congress's power over purely *intra* state commercial activities that nonetheless have substantial *inter* state effects." *United States v. Robertson,* 514 U.S. 669, 670, 115 S.Ct. 1732, 1733, 131 L.Ed.2d 714 (1995). Resort to category three was necessary in *Lopez* because possession of a firearm near a school (the crime at issue in that case) did not involve an instrumentality of, or have a connection to, interstate commerce.

The same cannot be said in this case. Even though Appellant's obligation to pay child support did not arise out of a typical business transaction, it still involves interstate commerce because Appellant's obligation to pay money crossed state lines. *E.g., Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 256, 85 S.Ct. 348, 356, 13 L.Ed.2d 258 (1964); *see also* 379 U.S. at 271, 85 S.Ct. at 364 (Black, J., concurring) ("Nor is "Commerce' as used in the Commerce Clause to be limited to a narrow, technical concept. It includes not only, as Congress has enumerated in the Act, "travel, trade, traffic, commerce, transportation, or communication,' but also all other unitary transactions and activities that take place in more States than one.").

The issue does not turn on the mere fact that Appellant lives in a state different from his children. Though true, it is the implication of this fact that is telling: "the difference in location of obligor and obligee requires that the satisfaction of the debt be through interstate means," *United States v. Mussari,* 95 F.3d 787, 790 (9th Cir.1996), *cert. denied,* --- U.S. ----, 117 S.Ct. 1567, 137 L.Ed.2d 712 (1997), and satisfaction of the obligation necessarily requires resort to some method of traversing state lines. *See also United States v. Sage,* 92 F.3d 101, 106-07 (2d Cir.1996), *cert. denied,* --- U.S. ----, 117 S.Ct. 784, 136 L.Ed.2d 727 (1997). This feature (which is a required element of the crime defined by the CSRA) qualifies as interstate activity and may be regulated by Congress. We thus join the other Circuits that have held that the CSRA falls within the second *Lopez* category as a proper exercise of Congressional authority under the Commerce Clause. *See United States v. Crawford,* 115 F.3d 1397, 1400 (8th Cir.1997); *United States v. Hampshire,* 95

F.3d 999, 1003-04 (10th Cir.1996), *cert. denied,* --- U.S. ----, 117 S.Ct. 753, 136 L.Ed.2d 690 (1997); *Mussari,* 95 F.3d at 790-91; *Sage,* 92 F.3d at 106-07.[5]

## *2. Tenth Amendment*

The Tenth Amendment to the United States Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." Appellant contends the CSRA runs afoul of the Tenth Amendment because the power to regulate familial relations lies with the States, as evidenced by the domestic relations exception to federal jurisdiction. Appellant's argument fails for three reasons.

First, the Tenth Amendment reserves to the States those matters that are not delegated to the federal government. As discussed above, the CSRA is a valid exercise of Congress's power under the Commerce Clause, and Congress's "valid exercise of authority delegated to it under the Constitution does not violate the Tenth Amendment." *Cheffer v. Reno,* 55 F.3d 1517, 1519 (11th Cir.1995). Second, "the domestic relations exception, as articulated by this Court ..., divests the federal courts of power to issue divorce, alimony, and child custody decrees." *Ankenbrandt v. Richards,* 504 U.S. 689, 703, 112 S.Ct. 2206, 2214, 119 L.Ed.2d 468 (1992). Obviously, the CSRA does not require federal courts to issue, modify, or otherwise consider divorce, alimony and child custody or support decrees. The CSRA is best understood as part of the scheme for enforcing child support decrees, and the "domestic relations exception" does not apply to efforts to enforce valid decrees issued by state courts. *Id.* at 701-02, 112 S.Ct. at 2214. Finally, the domestic relations

---

[5]Even if the third test were employed and a substantial effect on interstate commerce were required, the outcome would be the same. In determining whether such an effect exists, courts traditionally rely heavily upon Congressional findings. *E.g., Lopez,* 514 U.S. at 561-62, 115 S.Ct. at 1631-32; *Cheffer v. Reno,* 55 F.3d 1517, 1520-21 (11th Cir.1995). Congress made extensive findings regarding the effect of delinquent child support obligations on interstate commerce, causing at least one Court of Appeals to hold that the CSRA qualifies under *Lopez*'s third category. *See United States v. Parker,* 108 F.3d 28, 30-31 (3d Cir.1997) (petition for certiorari filed June 3, 1997); *see also Crawford,* 115 F.3d at 1400 n. 6 ("For similar reasons, we agree ... that the CSRA fits within the third *Lopez* category and therefore does not violate the commerce clause."); *Hampshire,* 95 F.3d at 1004 ("The CSRA also may be upheld because it regulates activities that are substantially related to and substantially affect interstate commerce.").

exception to federal jurisdiction generally applies to the diversity jurisdiction of federal courts and does not apply when Congress has specific authority to enact legislation. *See id.* at 696, 112 S.Ct. at 2211 (observing that federal jurisdiction in domestic matters arising from the District of Columbia held to be proper); *Cleveland v. United States,* 329 U.S. 14, 19, 67 S.Ct. 13, 15, 91 L.Ed. 12 (1946) (affirming conviction of religious believers in polygamy for violating Mann Act because "[t]he fact that the regulation of marriage is a state matter does not, of course, make the Mann Act an unconstitutional interference by Congress with the police powers of the States. The power of Congress over the instrumentalities of interstate commerce is plenary;...."). For these reasons, the CSRA does not violate the Tenth Amendment's reservation of State power.

*B. Sufficiency of the Evidence*

Appellant contends that there was insufficient evidence that he acted willfully in refusing to pay his child support obligations. "We will not reverse a conviction for insufficient evidence in a non-jury trial unless, upon reviewing the evidence in the light most favorable to the government, no reasonable trier of fact could find guilt beyond a reasonable doubt." *United States v. Schaltenbrand,* 930 F.2d 1554, 1560 (11th Cir.), *cert. denied,* 502 U.S. 1005, 112 S.Ct. 640, 116 L.Ed.2d 658 (1991). Appellant contends that he currently lacks the financial resources to pay his obligations. There is little doubt that this is true; under the facts of this case, however, Appellant's inability to pay does not automatically entitle him to a judgment of acquittal.

As the intent element in a criminal statute, the meaning of the term "willful" depends greatly upon its context. *See Ratzlaf v. United States,* 510 U.S. 135, 141, 114 S.Ct. 655, 659, 126 L.Ed.2d 615 (1994). Criminalization of the willful failure to pay is not new to the criminal code; it appears frequently in the tax statutes. *See, e.g.,* 26 U.S.C. § 7202 (1994) (willful failure to "collect ... and pay over" tax); 26 U.S.C. § 7203 (1994) (willful failure to pay estimated tax). The House Report to the CSRA also made specific reference to these provisions:

> The operative language establishing the requisite intent under [the CSRA] is "willfully fails to pay." This language has been borrowed from the tax statutes that make willful failure to collect or pay taxes a Federal crime, 26 U.S.C. §§ 7202, 7203. Thus, the willful failure standard of [the CSRA] should be interpreted in the same manner that Federal courts have

> interpreted these felony tax provisions. In order to establish willfulness under those provisions, the government must establish, beyond a reasonable doubt, that at the time the payment was due the taxpayer possessed sufficient funds to enable him to meet his obligation or that "the lack of sufficient funds on such date was created by (or was the result of) a voluntary and intentional act without justification in view of all of the financial circumstances of the taxpayer." *United States v. Poll,* 521 F.2d 329, 333 (9th Cir.1975). The willfulness element in the tax felony statutes requires proof of an intentional violation of a known legal duty, and thus describes a specific intent crime. *U.S. v. Birkenstock,* 823 F.2d 1026, 1028 (7th Cir.1987). The word "willfully" under the tax felony statutes imports a bad purpose or evil motive. *U.S. v. Bishop,* 412 U.S. 346, 361, 93 S.Ct. 2008, 2017, 36 L.Ed.2d 941 (1973). The Committee intends that the willful failure standard of [the CSRA] be given similar effect as the willful failure standard contained in these tax felony provisions.

H.R.Rep. No. 102-771, at 6 (1992). In light of the Committee Report, and the similarity between the CSRA and the tax statutes that criminalize willful failure to pay money, we conclude it is proper to rely on cases construing the intent element in those tax statutes when construing the CSRA's willfulness standard.

"Willfulness, as construed by our prior decisions in criminal tax cases, requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." *Cheek v. United States,* 498 U.S. 192, 201, 111 S.Ct. 604, 610, 112 L.Ed.2d 617 (1991). Our focus in this case is on the third element, which is typically met by proving that the defendant had the ability to fulfill his obligation and refused to do so. Here, Appellant lacked the ability to do so, but his inability was due to purposeful acts taken specifically to deprive him of his ability to pay his child support obligations. As declared in *United States v. Poll* (which was cited with approval in the House Report), willfulness can be proven if "the lack of sufficient funds on such date was created by (or was the result of) a voluntary and intentional act without justification in view of the financial circumstances of the taxpayer." 521 F.2d 329, 333 (9th Cir.1975). The reasonableness of this rule is obvious: "[o]therwise, a recalcitrant taxpayer could simply dissipate his liquid assets at or near the time when his taxes come due and thereby evade criminal liability." *United States v. Tucker,* 686 F.2d 230, 233 (5th Cir.), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 492, 74 L.Ed.2d 634 (1982); *see also United States v. Ausmus,* 774 F.2d 722, 725 (6th Cir.1985).

The record provides ample support for the district court's finding of willfulness. Appellant made numerous threats to quit his job as a pathologist and to live "like a monk." This unilateral decision deprived Appellant of the means to satisfy his child support obligation. Thus, although Appellant lacks the funds to pay, it is due solely to his decision to take steps specifically calculated to eliminate his ability to do so. His situation is no different than if he had taken his money and given it away, spent it, or otherwise disposed of it: Appellant's inability to pay is due to his own purposeful actions and therefore cannot constitute a defense to the charge.

Appellant has intimated that his decision to leave the medical field was motivated by religious considerations, and that failure to respect those considerations raises serious First Amendment concerns. Appellant has maintained (both in written and oral argument) that he is not raising an independent First Amendment challenge; rather, this argument is presented to demonstrate that Appellant did not act willfully or with bad motive. Regardless of the purpose of this argument, we note that there is no support in the record for this position. Appellant's explanation for leaving his job never rested on religious beliefs; his most direct response indicated that he simply did this because he could not reconcile with his wife. Appellant may have had the desire to leave his job in the past but refrained because the time was not right; yet somehow, upon being ordered to support his children the time became right. In light of his past threats to quit his job to avoid complying with the State Court's orders and his repeatedly expressed view that he should not have to support his children because they were in his ex-wife's custody, the district court was entitled to conclude that he left the medical field and took relatively low paying jobs with the specific purpose of making it impossible for him to pay child support. Appellant's conduct easily qualifies as willful failure to pay as defined by the CSRA.

### III. CONCLUSION

We conclude that Congress properly exercised its power under the Commerce Clause when it enacted the Child Support Recovery Act. We also conclude that passage of this law did not violate

10

the Tenth Amendment. Finally, we conclude that the evidence supports the District Court's finding of guilt. Accordingly, we AFFIRM Appellant's conviction.