**[PUBLISH]**

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE ELEVENTH CIRCUIT**

No. 97-4336

D.C. Docket No. 96-6076-CR-JAG

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
12/31/98
THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ABRAHAM R. BRAND,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Florida

**(December 31, 1998)**

Before HATCHETT, Chief Judge, RONEY and LAY*, Senior Circuit Judges.

HATCHETT, Chief Judge:

_____
* Honorable Donald P. Lay, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

We address issues of first impression in this appeal from a conviction under the Child Support Recovery Act of 1992 (CSRA or Act), Pub. L. No. 102-521, § 2, 106 Stat. 3403 (1992) (current version at 18 U.S.C.A. § 228).[1]  After a trial before a magistrate judge in the Southern District of Florida, appellant Abraham Brand was found guilty of willfully failing to pay a past due support obligation, in violation of the CSRA.  Upon conviction, the magistrate judge ordered Brand to pay in excess of $4 million in restitution to his ex-wife.  Brand now challenges his conviction, arguing that his failure to pay was not willful, and that the state court order that formed the basis of his support obligation under the Act is invalid.  Brand also challenges the restitution order, arguing that the magistrate judge calculated the restitution amount improperly and, alternatively, that he is unable to pay.  We reject Brand's contentions and affirm his conviction and sentence.

## I.  FACTS
### A.  The Marriage

Abraham Brand and Margrethe Stabell married in June of 1977.  Three children were born to this union:  a girl in 1980, a boy in 1982 and another girl in 1983.  During the marriage, Brand was a successful entrepreneur, and the family lived luxuriously in a 43-room waterfront home on Long Island, New York.  They had a private beach, a private tennis court, live-in nannies and housekeepers, a nine-passenger airplane and several expensive cars, including a

---

[1] While this appeal was pending, Congress enacted the Deadbeat Parents Punishment Act of 1998, Pub. L. No. 105-187, 112 Stat. 618 (1998), which amended 18 U.S.C.A. § 228 (provision codifying CSRA).

Rolls Royce limousine and a Ferrari. On their tenth wedding anniversary, Brand bought

Margrethe a $100,000 diamond ring.[2]

The couple separated in 1989. Brand moved Margrethe and the children to Florida;

Brand stayed in New York, sold the Long Island home for $2.7 million and moved into one of

the units in an apartment building that he purchased for $2.3 million. Later that year, Brand filed

for divorce.[3]

In December 1992, a Florida Circuit Court judge entered an order dissolving the Brands'

marriage. Neither Brand nor his lawyer were present at the final hearing. The court noted that it

had previously ordered Brand incarcerated for failing to pay $13,463 to Margrethe, which was

"intended to support his children and wife" temporarily during the pendency of the divorce

proceedings. Despite this sanction, Brand failed to pay the money or to report to the Broward

County Jail to serve his sentence. The state circuit judge awarded sole parental responsibility

and custody of the Brands' three minor children to Margrethe.

With respect to financial distribution, the court concluded that Brand had assets worth

$8,295,679 as of 1992. The court awarded Margrethe a 1986 Mercedes Benz automobile and all

of Brand's interest in two condominium units "as . . . lump sum alimony, maintenance and

support of the minor children, as well as providing a residence for the same[.]" The judge's order

also contained the following language:

---

[2] Two years later, without Margrethe's knowledge, Brand had the ring's diamond replaced with a cubic zirconia.

[3] Six months before filing for divorce, Brand told Margrethe that he "w[ould] never leave [her]" and convinced her to sign a post-nuptial agreement "only to prove that [she] love[d] [him]." This agreement was later set aside.

4. As and for additional lump sum alimony, maintenance and support of the wife and to provide security for the minor children in the style to which they have become accustomed, Husband shall pay to the Wife the sum of Three Million Nine Hundred Thirty Five Thousand ($3,935,000.00) Dollars, thirty (30) days from the date hereof. . . .

5. As and for child support Husband shall pay to the Wife the sum of Two Thousand Five Hundred ($2,500.00) [Dollars] per month provided that the sums stated in Paragraph 4 have in fact been paid to the Wife. Husband shall pay this amount on January 1, 1993, and shall postmark such payments on the first day of each and every month thereafter. Upon each child reaching the age of 18, either party may apply for appropriate modification of child support.

## B. Brand's Failure to Pay

Brand did not appeal or otherwise challenge the 1992 order dissolving his marriage. During the course of the next four years, Brand paid only about $10,000 to Margrethe pursuant to his obligation under the order. Meanwhile, he charged thousands of dollars to his American Express card–$28,749 in 1993 and just under $10,000 in 1994. Most of the charges were for restaurants and travel to places such as the Cayman Islands, Las Vegas, Chicago and China. The payments to American Express in 1993 came from the bank account of Patricia Pan, Brand's girlfriend, who lived with him in an apartment at Trump Tower in New York City. At that time, the average rent for a one-bedroom apartment in Trump Tower was between $4,000 and $5,000 per month.

In July of 1995, Margrethe taped a telephone conversation she had with Brand. Margrethe told him that she "had terrible financial problems." Brand replied that he had not sent her any money because she would "just use it with the lawyers against [him]." Brand then told Margrethe that he had "no way of paying" what was required of him under the state court order, regardless of "whether they bill[ed] [him] for . . . a hundred thousand . . . or four million." When the conversation turned to the monthly child support payments, however, Brand said that he

4

would "be glad to send [her] that," but that he had not previously paid it "because the lawyers [we]re trying to put [him] into jail in order to collect four and a half million dollars that [he] d[idn't] have."

Later in the conversation, Brand offered to give Margrethe $20,000 to $25,000 if she would come to New York to "talk." Apparently leery of Brand's motives, Margrethe asked if she would "have to sign any papers." He assured her that if she would "just come to New York ," he would "have [a] check for [her]." Margrethe therefore traveled to New York the following month to meet with Brand. When she arrived, Brand presented her with an agreement proposing to settle their dispute for approximately $200,000. Brand "got angry" when Margrethe refused to sign the document without consulting her lawyer. Brand never gave Margrethe the $20,000 to $25,000 he had promised.

### C. Brand's Arrest

Brand's failure to comply with the 1992 state court order resulted in his arrest in April 1996. Corporal Troy Keenhold, the arresting officer, had stopped Brand's vehicle near Allentown, Pennsylvania, for a traffic violation. During the course of casual conversation, Brand mentioned that he "had some businesses in New York." Keenhold then discovered that Brand was wanted for a family offense on a Federal Bureau of Investigation warrant issued in Florida. When Keenhold told Brand why he was being taken into custody, Brand responded that "the only thing he could think of was that [it] had to do with his divorce and the fact that he owed child support . . . in Florida." While being transported to the police station, Brand remarked that because this was "a civil matter with his wife," he felt that "if he left the State of

5

Florida he could not be touched." At the time of his arrest, Brand was wearing a Rolex watch that had an appraised replacement value of $6,000.

### D. The Federal Prosecution

In June 1996, the United States Attorney for the Southern District of Florida filed an information charging Brand with violating the CSRA, which proscribes the willful failure to pay "past due support obligations" with respect to children residing in another state. See 18 U.S.C.A. § 228(a). The CSRA defines a "past due support obligation" as any amount that (1) is owed pursuant to a state court order; (2) remains more than a year overdue or is greater than $5,000; and (3) is intended for "support and maintenance of a child or of a child and the parent with whom the child is living[.]" See 18 U.S.C.A. § 228(d)(1).

Brand pleaded not guilty and consented to a trial before a magistrate judge. He subsequently moved to dismiss the information, arguing that the underlying state court order was invalid because it was unconstitutionally vague with respect to delineating what Brand owed as his "support obligation" for purposes of his compliance with the CSRA. The magistrate judge denied the motion and, on September 3, 1996, the case proceeded to trial without a jury.

### 1. Brand's Trial

The government presented its case through exhibits and the testimony of eight witnesses: Margrethe, Corporal Keenhold (the arresting officer), Joseph Tenhagen (a jewelry appraiser), Kenneth Annibale (one of Brand's former business partners), Philip Unterberg (a sales representative from a security systems company), Philip Disque (a lawyer and certified public accountant), Jessica Rohm (a real estate broker), and Robert Passero (a financial auditor with the United States Attorney's Office). The defense case consisted of the introduction into evidence

6

of a transcript and order from a mid-1996 hearing before the circuit judge, wherein she attempted to clarify the financial distribution portion of the underlying dissolution order.[4] Brand did not testify.

The evidence adduced at trial largely involved Brand's finances and assets following the entry of the state circuit judge's 1992 order. That evidence may be summarized as follows:

### a. Audio Marketing International

Brand was a 60 percent equity partner of Audio Marketing International d/b/a Goldmund's (Audio Marketing) until the company's dissolution in 1995. Audio Marketing was a distributor for a "high-end audio [equipment] manufacturer." From mid-1993 to March 1995, approximately $135,000 was deposited into Audio Marketing's bank account. Kenneth Annibale, a 40 percent equity partner, was an authorized signatory on that account. Brand instructed Annibale to write company checks to Patricia Pan, who did not work for Audio Marketing. As previously mentioned, Pan lived with Brand at Trump Tower and paid his American Express bills in 1993. More than half the checks drawn on Audio Marketing's account were paid to Brand or Pan.

### b. The Pennsylvania Residence

Philip Unterberg, a residential sales representative for ADT Security Systems, testified that in April 1995 he visited a house in Leighton, Pennsylvania, in response to a call from "Ed Maglione." Maglione had requested someone to survey the house and give him a cost estimate for the installation of a security system. When Unterberg arrived at the house he met Brand who

---

[4] Further details regarding this hearing are set forth in part II(B)(1) of this opinion.

7

introduced himself as Maglione.[5]  Brand said that he needed a security system for the home because he "traveled . . . back and forth to New York quite often."

That day, Unterberg drew up an agreement for a system.  On the agreement, Brand listed several persons to be contacted in the event of an emergency:  Ed Maglione (i.e. Brand), "Patricia" who lived in New York (presumably Pan, his girlfriend), and Avis Maglione (whom Brand represented was his brother).[6]  Brand then wrote a check to ADT Security Systems for approximately $1,000.

In response to another call, Unterberg again went to the Pennsylvania house in February of 1996.  Unterberg's boss accompanied him on this occasion.  Brand had apparently told Unterberg that he was dissatisfied with the security system and wanted an upgrade.  During this visit, Unterberg and his boss went into the garage with Brand and saw approximately 35 to 40 BMW motorcycles.  Brand said that he collected them.  When Unterberg's boss inquired about purchasing a BMW motorcycle, Brand told him that he could obtain one for between $4,000 and $14,000.  ADT Security Systems charged Brand another $1,000 for the upgrade at the Pennsylvania residence.

### c.  Real Estate Holdings

The testimony at trial linked Brand to two properties in New York that were sold for millions of dollars after the entry of the state court order.  In 1989, Brand purchased property at 16 East 78th Street in New York City for $2.3 million.  He then made capital improvements on

---

[5] At the time of his arrest in 1996, Brand was driving a van that had a New York license plate, but was registered in the name of Edward Maglione of Leighton, Pennsylvania.  Brand told the arresting officer that Maglione was a friend.

[6] Brand's nickname is "Avi."

8

the property, raising its value to $2.76 million. Approximately two years after the purchase, Brand sold this property to Fresh Image, Inc. for $950,000. At that time, one of the officers of Fresh Image was Alexander Curtis. Curtis would later become the administrator of Audio Marketing, Brand's distributorship, which also eventually occupied the ground floor of the building at 16 East 78th Street. Philip Disque, a certified public accountant who had previously been retained to assess Brand's financial situation in 1989 and 1992, testified that Brand's sale of this property at a loss of $1.8 million to Curtis, a business acquaintance, was "questionable." Disque opined that Brand had engineered this sale to retain control of the property.

Jessica Rohm, a real estate broker, testified that she went to see the 16 East 78th Street property in 1993 (about two years after Brand "sold" it to Fresh Image). At that time, she met Brand, who said he was "representing the owner." Rohm represented a group of Brazilian investors who ultimately purchased the property for $2.06 million in May of 1993. Rohm testified that the property yielded annual rental income of $200,000. Prior to the sale, Brand was the "only person [Rohm] ever had any contact with" and the only person she "negotiate[d] with." At the closing, Curtis was present on behalf of the seller, Fresh Image. Brand was also present and surrendered Audio Marketing's leasehold interest in the property. Rohm characterized Brand as an "interested party" who was "involved" in the closing.

In the fall of 1994, Brand called Rohm and told her "I have another property for sale." He inquired about whether the Brazilian investors would be interested. Brand informed Rohm that a corporation owned this particular property and that she "shouldn't let anybody know that he [Brand] [was] involved with the property." Brand showed Rohm the building, which was

9

located at 22 East 78th Street–very close to the one previously sold. Brand negotiated the sale price with Rohm, and the property was ultimately sold in September of 1995 for $1.318 million.

Rohm testified that the building at 22 East 78th Street had a single tenant. Brand told Rohm that "we" had given the tenant $100,000 so that she would vacate the premises before the closing. Annibale, Brand's former business partner, also testified that Brand had spoken of a townhouse that he owned that had one tenant. Brand told Annibale that the townhouse was located in New York on 78th Street.

Brand and Rohm informally discussed other real estate deals while they were negotiating the sale of the 22 East 78th Street property. Brand said that he wanted to offer another property for sale that was on Long Island. He also expressed an interest in buying an apartment at Trump Tower or Olympic Tower for around $1 million.

## 2. Brand's Conviction and Sentence

Brand again raised his challenges to the validity of the underlying state court order in a motion for judgment of acquittal. He also argued in this motion that the government had not proved "willfulness" under the CSRA because the state court order was too "vague and indefinite" for him to have known how to comply with it. The magistrate judge denied this motion and issued an order finding Brand guilty of violating the CSRA. The magistrate judge also denied Brand's subsequent motion for a new trial.

Brand's Presentence Investigation Report (PSI) initially set the amount of his restitution at $115,962, representing back child support. The government objected, however, and advised the probation office of its position that Brand's restitution amount should include the $3.935 million lump sum owing under the state court order. The probation office agreed and, in an

10

addendum to the PSI, concluded that the lump sum "appear[ed] [to be intended] for support of the children and [Brand]'s ex-wife," thereby falling within the CSRA's definition of a "past due support obligation." Accordingly, the probation office adjusted the previous restitution figure to include the lump sum, and set the final amount at $4,050,963.41.

Brand objected to the increase in restitution, arguing that the $3.935 million lump sum award was not "child support in toto," but rather was meant to cover a multitude of non-support-related purposes. Brand raised this argument at his sentencing hearing and also claimed to be incapable of paying a multi-million dollar restitution obligation. The magistrate judge rejected Brand's contentions and agreed with the PSI's calculation of the restitution amount to include the monthly child support arrearage in addition to the lump sum award. With respect to Brand's ability to pay, the magistrate judge noted that "there is no explanation" for what happened to the "trail of monies" that the trial evidence linked to Brand. Accordingly, the magistrate judge ordered Brand to pay restitution in the amount of $4,050,963.41 to Margrethe and sentenced him to time served. This appeal followed.

## II. DISCUSSION

### A. Brand's Conviction

The CSRA criminalizes the "willful[] fail[ure] to pay a past due support obligation with respect to a child who resides in another State[.]" 18 U.S.C.A. § 228(a). The CSRA defines a "past due support obligation" as any amount

> (A) determined under a court order or an order of an administrative process pursuant to the law of a State to be due from a person for the support and maintenance of a child or of a child and the parent with whom the child is living; and (B) that has remained unpaid for a period longer than one year, or is greater than $5,000[.]

11

18 U.S.C.A. § 228(d)(1).

The state circuit judge's order dissolving the Brands' marriage provided that Brand was to pay Margrethe a lump sum of $3.935 million in addition to $2,500 monthly. The lump sum was for "alimony, maintenance and support of [his] wife, and to provide security for the minor children in the style to which they ha[d] become accustomed." The monthly obligation was for "child support." Brand's CSRA conviction was based upon his failure to comply with this order.

In challenging his conviction, we construe Brand's argument on appeal as being twofold. First, Brand takes issue with the CSRA's "willfulness" element.[7] He asserts that the underlying state court order that purported to delineate his payment obligation was so unclear that he could not reasonably have known how to comply with it, thereby making his failure to pay innocent or justifiable, rather than willful. Brand also challenges his conviction, arguing that the government's case against him was based upon an invalid state court order. Brand contends that the underlying order was not only unconstitutionally vague, but also void for failure of a "condition precedent." We address each of Brand's asserted bases for reversal.

### 1. Willfulness

---

[7] The remaining elements of the CSRA are satisfied in this case, i.e., Brand (1) failed to pay (2) a past due support obligation (3) with respect to children who reside in another state. See United States v. Johnson, 114 F.3d 476, 482 (4th Cir. 1997) (describing elements of CSRA offense), cert. denied, 118 S. Ct. 258 (1997). It is undisputed that the state circuit judge's order sought to impose upon Brand a "support obligation." Brand also concedes that in excess of $5,000 of this "support obligation" remained unpaid for more than one year. Finally, Brand and his children resided in different states during the relevant time period. Accordingly, the only element subject to dispute is whether Brand's violation of the Act was "willful."

We affirm the magistrate judge's conclusion that Brand's failure to pay his support obligation under the Act was willful. Brand contends that he could not determine from the language of the state court order precisely how much he owed as his "support obligation" because the state circuit judge intended for the $3.935 million lump sum to serve many different purposes, only one of the many purposes was support for Margrethe and the children. Brand emphasizes that the state circuit judge failed to designate what portion of the lump sum was meant to fulfill Brand's support obligation. Brand argues that this lack of clarity rendered his compliance with the CSRA "impossible" and, therefore, that his failure to pay was not "willful" within the meaning of the Act.

We disagree. To prove willfulness under the CSRA, the government had to prove that "the law imposed a duty on the defendant, that the defendant knew of this duty, and that [the defendant] voluntarily and intentionally violated that duty." United States v. Williams, 121 F.3d 615, 621 (11th Cir. 1997), cert. denied, 118 S. Ct. 1398 (1998). In this case, the state court order expressly and unequivocally imposed a duty upon Brand to pay at least $2,500 per month in "child support." Additionally, the order explained that Brand was already in arrears for failure to pay a previously delineated support obligation of $13,463, and that he had been ordered incarcerated because of his non-payment of this sum. The plain language of the state court order was therefore sufficient to charge Brand with knowledge of his duty in this regard. Indeed, Brand's conduct makes clear that he was aware of his support obligation. Prior to his arrest, Brand paid approximately $10,000 toward child support. He also recognized his liability in the taped telephone conversation with Margrethe. Moreover, he acknowledged that he owed child support at the time of his arrest.

13

Notwithstanding his awareness of this obligation, Brand voluntarily and intentionally violated his duty to pay. Thus, contrary to Brand's assertion, the extent that the $3.935 million lump sum was meant to supplement his monthly child support obligation is irrelevant. Although Brand may not have known the exact amount of his total "support obligation," because the state court order did not delineate how much of the lump sum award was meant for support, this did not relieve Brand of his duty to pay what he did know to be the minimum amount owing in child support – $2,500 per month. Brand would have had a stronger argument on the willfulness element had he complied with the express obligation to make monthly child support payments. This, however, he failed to do. As a result, the magistrate judge correctly concluded that Brand willfully violated the state court order.

## 2. Validity of the State Court Order

Brand asserts that the state court order forming the basis of his CSRA conviction is invalid for two reasons. First, he argues that the order is unconstitutionally vague because it did not specify the amount owing as his "support obligation" for purposes of his compliance with the CSRA. Second, Brand contends that the state court order was "void" because its language–i.e., "Husband shall pay [$2,500] per month provided that the [$3.935 million] ha[s] in fact been paid" (emphasis added)–indicates that Brand's payment of the lump sum was a "condition precedent" to his obligation to pay the monthly child support. Brand's argument in this respect boils down to the assertion that his deliberate noncompliance with the lump sum obligation relieved him of all responsibility for child support payments, thereby giving the government no basis for prosecuting him under the CSRA.

14

Brand's collateral attack of the state court order is not cognizable.[8]  The language of the CSRA merely requires the <u>existence</u> of a "past due support obligation."  The Act's terms do not require that such an obligation be "valid."  The Supreme Court used similar reasoning in <u>Custis v. United States</u>, 511 U.S. 485 (1994), which held that a defendant in federal sentencing proceedings has no right to challenge the validity of previous state convictions that are used as the basis for a sentence enhancement under the Armed Career Criminal Act, 18 U.S.C. § 924(e).  The Court observed that the statute "focuses on the <u>fact</u> of the conviction and nothing suggests that the prior final conviction may be subject to collateral attack for potential constitutional errors[.]"  <u>Custis</u>, 511 U.S. at 490-91.

Within the context of a Tenth Amendment challenge to the constitutionality of the CSRA, this court recognized that "the [Act] does not require federal courts to issue, modify, or otherwise consider divorce, alimony and child custody or support decrees."  <u>Williams</u>, 121 F.3d at 620.  <u>See</u> <u>also</u> <u>United States v. Black</u>, 125 F.3d 454, 463 (7th Cir. 1997) ("the CSRA does not permit a federal court to revise the domestic relationship adjudicated by the State courts or to

---

[8] Even if it were, however, his arguments are entirely devoid of merit.  First, the 1992 order is not unconstitutionally vague as applied to Brand.  In the general sense, "[v]oid for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed."  United States v. National Dairy Prods. Corp., 372 U.S. 29, 32-33 (1963).  Brand's vagueness challenge fails for the same reasons his argument on the willfulness element fails:  the plain language of the order was sufficient to put Brand on notice that he was minimally obligated to pay $2,500 per month, and his conduct following entry of the order indicates that he was aware of this duty.  Second, Brand's argument that the order is void for failure of a "condition precedent" simply defies reason.  The only interpretation of the order that makes sense is that Brand's child support payments would <u>only</u> be $2,500 per month if he paid the $3.935 million lump sum, <u>i.e.</u>, Brand's failure to pay the lump sum could result in an increase to the monthly child support figure.  In fact, the state circuit judge later confirmed this to be her intent during the 1996 hearing to clarify the financial distribution portion of the underlying order.

modify any part of a State court decree" (internal quotation marks omitted)), cert. denied, 118 S.

Ct. 1327, 1821 (1998); United States v. Bongiorno, 106 F.3d 1027, 1033-34 (1st Cir. 1997)

("[T]he CSRA comes into play only after a state court issues a child support order, and it does

not authorize a federal court to revise the underlying decree."); United States v. Sage, 92 F.3d

101, 107 (2d Cir. 1996) (same as Black), cert. denied, 117 S. Ct. 784 (1997).  As our predecessor

circuit reasoned in United States v. Bailey:

> A CSRA prosecution turns only on the defendant's violation of a state court
> order.  It does not turn on the fairness of the order, the reasons underlying the
> state court's issuance of the order, the defendant's relationship with his children
> or former spouse, or any other matter involving relitigation of a family law issue.
> Moreover, there is no language in the CSRA allowing the federal court to look
> beyond the four corners of the state child support order or permitting the
> defendant to collaterally attack the state court order in federal court.

115 F.3d 1222, 1232 (5th Cir. 1997) (rejecting appellant's contention that CSRA offends

principles of federalism and comity), cert. denied, 118 S. Ct. 866 (1998).[9]

Further supporting our conclusion that Brand is now barred from collaterally attacking

the state court order is Brand's failure to contest the order in state court.  Brand did not seek

modification or clarification of the order, nor did he appeal from it.  For this reason, and because

the state court order was the culmination of a judicial proceeding, our refusal to entertain

Brand's collateral attack in this case does not implicate due process concerns.  See, e.g., United

States v. Mendoza-Lopez, 481 U.S. 828, 839-40 (1987) (relying on due process principles to

permit defendants charged with reentering country after deportation to challenge validity of

underlying deportation orders because the administrative deportation proceedings had

---

[9] But see United States v. Lewis, 936 F. Supp. 1093, 1101-03 (D.R.I. 1996) (concluding that "the CSRA does allow relitigation of the merits of the underlying state court order" and reasoning that the statute was ambiguous on this point).

16

"effectively eliminate[d] the right of the alien[s] to obtain judicial review"); United States v. Johnson, 114 F.3d 476, 482-83 (4th Cir.) (finding that CSRA defendant could not use Mendoza-Lopez to challenge underlying support order where he failed to directly appeal or collaterally attack the order in state court), cert. denied, 118 S. Ct. 258 (1997).

### B. Brand's Sentence

In 1992, the state circuit judge found that Brand had a net worth in excess of $8 million before ordering him to pay the $3.935 million lump sum and $2,500 per month in child support. Under the express language of the order, the lump sum served three purposes:  (1) "alimony"; (2) "maintenance and support of [Margrethe]"; and (3) "security for the minor children[.]"  An individual convicted for violating the CSRA is required to pay restitution "in an amount equal to the past due support obligation as it exists at the time of sentencing."  18 U.S.C.A. § 228(c).  The CSRA defines "past due support obligation" broadly to include amounts due either "for the support and maintenance of a child[,]" or for support and maintenance of "a child and the parent with whom the child is living."  18 U.S.C.A. § 228(d)(1)(A).

Applying the foregoing statutory language to the financial obligations set forth in the state court's 1992 dissolution order, the magistrate judge found that Brand's "past due support obligation" under the CSRA included his unpaid monthly child support in addition to the entire $3.935 million lump sum.  Accordingly, the magistrate judge ordered Brand to pay $4.05 million in restitution.  Brand claims that the restitution order should be set aside because the magistrate judge calculated the restitution amount improperly and, alternatively, because he is unable to pay.

### 1. Inclusion of Multi-Purpose Lump Sum Obligation in Restitution Order

Brand contends that the magistrate judge erred in using the entire lump sum obligation to calculate the amount of his restitution payment. He emphasizes that the state circuit judge intended for the $3.935 million to serve several purposes that were unrelated to "child support," making total inclusion of the lump sum improper. Brand claims that he should be held accountable only for what the state circuit judge specifically intended to be the overall child support obligation, without regard to whatever sum was intended as support and maintenance for Margrethe. Brand's argument for excluding Margrethe from the equation, at least as we understand it, is this: the custodial parent clause after the disjunctive "or" in the CSRA's definition of a "past due support obligation" is inapplicable to the facts of this case because Florida law has clear delineations for child support, alimony and equitable distribution. In other words, Brand suggests that the language Congress used to define a "past due support obligation" is not as broad as it appears because, in a state such as Florida where courts have the capacity to earmark specific portions of lump sums for purposes related to child support, the issue of support and maintenance for a custodial parent becomes irrelevant. For the reasons that follow, we reject Brand's contentions and affirm the magistrate judge's $4.05 million restitution order.

While the CSRA charge was pending against him in federal court, Brand filed a petition in state court for "clarification" of the underlying support order in an effort to determine what percentage of the lump sum constituted his CSRA "support obligation." In June 1996, the state circuit judge held a hearing wherein she attempted to elaborate upon the reasons why she structured the financial distribution portion of the dissolution order as she did. At the hearing, the judge explained that the $3.935 million was meant to serve several "inextricably combined" purposes, including (1) "lump sum alimony in the sense of distribution," (2) "lump sum alimony

18

[that was] not distribution," (3) "spousal support" and (4) "security for the [future] support of the children." The judge also explained that the lump sum was meant in part to enable Margrethe to "bear some of the costs of the maintenance of the[] children." The judge also stated that, because all of these purposes were interrelated, she was unable to designate precisely how much of the lump sum constituted Brand's support obligation.

Moreover, the state circuit judge indicated that she structured Brand's overall obligation in such a way as to use the large lump sum to offset the relatively low monthly child support figure. Thus, Brand's failure to pay the $3.935 million lump sum could have given rise to an increase in his monthly child support obligation, and some percentage of the lump sum constituted security for the children's future support. The judge could not, however, specify with any particularity how much of the lump sum secured future child support or offset the $2,500 monthly obligation.

In challenging the restitution order, Brand relies upon the inability to determine specifically what portion of the lump sum constitutes his "support obligation." This lack of specificity did not require the magistrate judge to exclude the lump sum from consideration in calculating the amount of Brand's restitution. The CSRA required the magistrate judge to set restitution in an amount equal to Brand's "past due support obligation." We hold that the $3.935 million lump sum fell within the CSRA's definition of this phrase.

Brand's lump sum obligation served a variety of purposes relating to Margrethe and the children. As for Margrethe, the $3.935 million constituted lump sum alimony in the sense of both distribution of assets and spousal support. We note that, in the ordinary case imposing restitution under the CSRA, it is unlikely that a "past due support obligation" would encompass

19

monetary obligations that served these types of purposes. As for the children, however, the state circuit judge intended for the $3.935 million lump sum to serve as security for future child support, and to enable Margrethe to contribute her share of support for the children. Whatever percentage of the lump sum was meant to serve these purposes falls well within the ambit of the CSRA's definition of a "past due support obligation."

We look to the CSRA's plain language to resolve this issue. Although Brand makes much of the title "Child Support Recovery Act," it is significant that the Act's definition of a "past due support obligation" does not limit itself to "child support" as that term is commonly understood. The CSRA defines a "past due support obligation" as any amount "due from a person for the support and maintenance of a child or of a child and the parent with whom the child is living[.]" 18 U.S.C.A. § 228(d)(1)(A) (emphasis added). The definition therefore makes obvious that Congress intended for a "past due support obligation" to mean something broader than merely "child support." For this reason, the Act clearly contemplates that support for a custodial parent may be included within a "past due support obligation" under certain circumstances. We think that the circumstances present in this case are of the type that Congress seems to have envisioned in drafting the definition of a "past due support obligation" to encompass support for a custodial parent.

We find particularly persuasive the fact that the purposes that the lump sum served with respect to Margrethe were, according to the state judge, inextricably intertwined with the purposes that the lump sum served with respect to the children. Because the multiple purposes were so interrelated, it was impossible for the state circuit judge to attribute any specific dollar amount to any specific purpose. Moreover, the state circuit judge uniquely configured the

20

dissolution order so as to offset Brand's monthly child support obligation with the large lump sum. These factors greatly diminish the significance of the fact that the $4.05 million restitution order ultimately included some indefinite figure representing lump sum alimony for Margrethe. Whatever this figure was, it became enmeshed with the support-related purposes of the remainder of the lump sum obligation, and thus became relevant to the magistrate judge's calculation of Brand's restitution for his "past due support obligation" under the CSRA.

The issue in this case, as the parties have framed it, ultimately requires us to determine not whether any portion of the lump sum may properly be included in calculating Brand's restitution, but rather the extent to which the lump sum should be used in that calculation. Notably, Brand concedes that his past due obligation of child support consists of more than merely his $2,500 per month arrearage. This is because, as the state circuit judge explained, part of the $3.935 million was intended to assist Margrethe in contributing her financial share of the children's support. Brand construes this to mean that the judge implicitly intended for $5,000 per month to constitute the total child support obligation between both parents. Accordingly, Brand would have this court vacate his sentence and order the district court to set his restitution in the amount of $250,000–the figure obtained when multiplying the combined monthly child support contributions for he and Margrethe ($5,000) by the number of months Brand failed to pay support (50). As we have already explained, this course of action is unnecessary given the "inextricably combined" purposes that the judge intended for the lump sum to serve. We point this out only to emphasize that it is conceptually irrelevant whether we accept Brand's restitution calculation of $250,000 or affirm the magistrate judge's order of $4.05 million. Either of these

21

results requires us to go behind the language of the underlying support order. Brand merely objects to our doing so in a manner that works to his detriment.

We address one final point. In affirming the magistrate judge's restitution order, we consider the definition of "past due support obligation" in its entirety and rely upon the clause following the disjunctive "or," which authorizes the inclusion of sums for maintenance and support of a custodial parent. Again, the definition of a "past due support obligation" is any amount due "for the support and maintenance of a child <u>or</u> of a child and the parent with whom the child is living[.]" 18 U.S.C.A. § 228(d)(1)(A) (emphasis added). Brand contends that Florida law eliminates the need for us to resort to the latter, custodial parent clause. He suggests that in a state such as Florida, where the magistrate judge could have designated with specificity what portion of the lump sum was related to child support, it is only necessary for us to consider the language <u>preceding</u> the disjunctive "or," which refers to maintenance and support of a child without reference to the custodial parent. Accordingly, Brand argues, we should construe the Act so as to limit his restitution to the amount specifically intended as "child support" in the state circuit judge's order, without considering what portion of the lump sum was meant as maintenance and support for Margrethe.

For us to reach this result would be to interpret the Act so as to require federal courts to delve into the vagaries of state marital dissolution law in order to arrive at appropriate restitution orders for CSRA offenders. Congress chose to create its own definition of a support obligation–independent of analogous state law concepts–for purposes of federal prosecutions under the CSRA. We will therefore follow the plain language of the Act broadly defining "past

22

due support obligation" to include support for custodial parents, and we will interpret this language without regard to the potential interplay of state law.

The foregoing rationale compels our conclusion that Brand's "past due support obligation" under the CSRA encompasses both the $2,500 per month arrearage, plus the entire $3.935 million lump sum. We therefore hold that the magistrate judge properly calculated the amount of Brand's restitution.

### 2. Brand's Ability to Pay

The CSRA provides that upon conviction "the court shall order restitution under [18 U.S.C. §] 3663 in an amount equal to the past due support obligation as it exists at the time of sentencing." 18 U.S.C.A. § 228(c). Under section 3663, a court has the discretion to "order . . . that the defendant make restitution to any victim" after considering, among other things, "the financial resources of the defendant[.]" 18 U.S.C.A. §§ 3663(a)(1)(A) and (a)(1)(B)(i)(II) (West Supp. 1998). After calculating Brand's "past due support obligation," the magistrate judge considered the evidence adduced at trial and assessed Brand's ability to pay before setting restitution at $4.05 million.[10]

---

[10] The government suggests that the CSRA's reference to section 3663 "simply provides a procedure for imposing restitution" and does not necessarily mean that the Act incorporates section 3663's requirement that a defendant's ability to pay be "consider[ed]." Relying upon the language used in section 228(c), as well as the statute's legislative history, the government argues that restitution under the CSRA is mandatory and a defendant's ability to pay is irrelevant. We think that the government's position is well-taken, especially given that the amendments to 28 U.S.C. § 228 contained in the Deadbeat Parents Punishment Act of 1998 replaced the prior reference to section 3663's discretionary restitution provision with a reference to 18 U.S.C. § 3663A (providing for "[m]andatory restitution to victims of certain crimes"; effective April 1996). Nonetheless, we need not reach this issue because, in this case, the magistrate judge did consider Brand's ability to pay, and did not err in concluding that he had assets sufficient to satisfy the $4.05 million restitution order.

Brand contends that the restitution order should be set aside because the evidence did not demonstrate that he had the ability to pay $4.05 million. At the sentencing hearing, Brand submitted a financial affidavit stating that his monthly gross income was $1,200, his monthly expenses totaled $1,730, and that his net worth was $2,200. Addressing the court through allocution, Brand said that his net worth was "never ever what they said it was" and that the estimates used in the state court proceedings were based upon real estate valuations that were at best "optimistic."

The magistrate judge offered to hold an evidentiary hearing in order to afford Brand the opportunity to present evidence in support of his contention that he was unable to pay. Brand's counsel, however, told the magistrate judge that Brand was "of the opinion that his financial affidavit [wa]s sufficient on its face, and for that reason he ha[d] completed . . . his presentation." Accordingly, Brand chose "not [to] ask[] the court to conduct an[] evidentiary hearing[]" on the ability to pay issue.

Although section 3663(a)(1)(B)(i) requires a court to "consider" a defendant's ability to pay in determining whether restitution is appropriate, the court need not make "specific factual findings" in this regard. United States v. Davis, 117 F.3d 459, 463 (11th Cir.), cert. denied, 118 S. Ct. 355, 395 (1997). "A defendant who disputes his ability to pay restitution bears the burden of demonstrating his financial resources by a preponderance of the evidence." United States v. Twitty, 107 F.3d 1482,1494 n.14 (11th Cir.), cert. denied, 118 S. Ct. 253 (1997). We will not overturn the magistrate judge's restitution order in this case unless "the record is devoid of any evidence that [Brand] is able to satisfy [it]." Davis, 117 F.3d at 463 (internal quotation marks omitted).

We conclude that the evidence presented at trial was more than sufficient to support the magistrate judge's finding that Brand–whose financial dealings were plainly suspect–had the ability to pay $4.05 million in restitution to Margrethe.

### III.  CONCLUSION

Through its enactment of the Child Support Recovery Act, Congress sought to address conduct precisely like Brand's.  Because the evidence indicates that Brand's failure to pay his past due support obligation was willful, and because his collateral attack on the state court's 1992 order is not cognizable, we affirm Brand's conviction.  We also affirm the magistrate judge's order compelling Brand to pay $4,050,963.41 in restitution to Margrethe because the entire lump sum figure was properly used to calculate the amount of his past due support obligation, and because the evidence overwhelmingly supported the magistrate judge's conclusion that Brand had the ability to pay.

Accordingly, we affirm the conviction, sentence and restitution orders.

**AFFIRMED.**